Irwin **HARRIS**, M.D., Plaintiff–Appellant,

v.

**BELLIN MEMORIAL HOSPITAL and Confidential Peer Review, Ltd.,** Defendants–Appellees.

Nos. 92–2785, 92–2942.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1993.

Decided Jan. 7, 1994.

Jeffrey M. Cross (argued), P. Matthew Glavin, Ross & Hardies, Chicago, IL, for plaintiff–appellant.

Gregory B. Conway (argued), Jon Marvin Counsell, Liebmann, Conway, Olejniczak & Jerry, Green Bay, WI, Paul H. Grimstad (argued), Lee J. Fehr, Nash, Spindler, Dean & Grimstad, Manitowoc, WI, Linda Haddad, Horty, Springer & Mattern, Pittsburgh, PA, for defendants-appellees.

Before CUMMINGS and FLAUM, Circuit Judges, and WILL, District Judge.[*]

CUMMINGS, Circuit Judge.

This is an appeal from summary judgment granted in favor of the defendants Bellin Memorial Hospital ("Bellin") and Confidential Peer Review, Ltd. ("CPR") in a diversity action, 28 U.S.C. § 1332. The Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Plaintiff filed his notice of appeal on July 24, 1992, which was assigned docket number 92–2785 in this Court. Judgment was entered on the district court's orders on July 27, 1992. The appeal was therefore filed three days prematurely because there was not yet a final judgment under Fed.R.Civ.P. 58. This defect was cured, however, when the final judgment was entered. Fed. R.App.P. 4(a)(2); *Metropolitan Life Ins. Co. v. Estate of Cammon,* 929 F.2d 1220 (7th Cir.1991). Plaintiff's second notice of appeal, filed on August 10, 1992 and assigned docket number 92–2942, is therefore duplicative of

the earlier appeal. It is accordingly dismissed.

A grant of summary judgment is reviewed *de novo. Lister v. Stark,* 942 F.2d 1183, 1187 (7th Cir.1991). If, after viewing the facts and the reasonable inferences therefrom in the light most favorable to the non-moving party, it is clear that no reasonable jury could return a verdict in its favor, then summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 255, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202. In this case, because no reasonable jury correctly applying substantive law could find in favor of plaintiff, the grant of summary judgment for defendants is affirmed.

## Background

Plaintiff, now a citizen of Cincinnati, Ohio, is a cardiologist and cardiac surgeon who was associated with defendant Bellin between November 1972 and April 1989. Bellin is located in Green Bay, Wisconsin. Dr. Harris was a member of Bellin's staff and held cardiac, vascular, and thoracic privileges. His practice consisted in large part of "high-risk" cardiac surgeries, that is, operations on patients who presented a higher risk of complications or death than the general pool of cardiac patients. By 1988 most of plaintiff's referrals were from another doctor on Bellin's staff, Dr. Peter Fergus, who apparently was more willing than other doctors in Green Bay to refer high-risk cardiac patients for surgery. Because other cardiac surgeons at Bellin often refused to operate on these high-risk patients, Dr. Fergus in turn relied on Dr. Harris to operate on them. R. 45, Exhibit C at ¶ 5.

Due in part to the high level of mortality and complications among plaintiff's patients and in part to complaints by the nursing staff concerning Dr. Harris' erratic behavior during surgery, the hospital undertook several reviews of his surgeries. In October 1988 Dr. Stewart Gifford, Chairman of the Department of Surgery but not himself a cardiologist, reviewed eight of plaintiff's surgical mortalities and concluded that there was no

[*] Hon. Hubert L. Will, District Judge of the Northern District of Illinois, sitting by designation.

evidence that plaintiff's treatment of these patients was anything but excellent. By March of 1989, however, Dr. Harris' mortality rates were even higher than they had been in 1988. An internal *ad hoc* committee was formed to investigate his practice. The committee concluded that the mortality and infection rates for Dr. Harris' patients were unusually high and recommended that an outside investigative team review his cases. In addition, the committee requested that Dr. Harris refrain from operating on high-risk cardiac patients until the conclusion of the outside review. As a result, Dr. John Martin, President of Bellin's Medical Staff, met with Dr. Harris and told him that unless he agreed to refrain from operating on high-risk patients (to be determined by Dr. Fergus, the referring physician) his surgical privileges would be temporarily suspended. Dr. Harris agreed not to operate on high-risk patients except in emergencies.

In April 1989 Bellin retained CPR, which has its principal place of business in Kenosha, Wisconsin, to review Dr. Harris' performance. CPR, an organization comprised of physicians with academic and medical credentials, reviews the performance of health care providers throughout the United States. A CPR review consists of four phases: determining the case mix and time frame to be reviewed; reviewing administrative records; on-site inspection of medical records selected by the team; and preparing a final report that includes findings, conclusions, and recommendations. Consistent with this procedure, CPR first decided to review all of plaintiff's 1988 surgeries. In its on-site inspection CPR ranked Dr. Harris' surgeries on a scale of one to five, with a one indicating care of good quality and a three or higher representing substandard care. Plaintiff received a one or two for forty-eight of the surgeries reviewed by CPR, and a three or higher for the remaining nineteen. In eleven cases the team questioned plaintiff's use of an intra-aortic balloon pump. It concluded that out of the sixty-seven cases reviewed, Dr. Harris displayed a questionable technique in fourteen of his operations and an inappropriate technique in nine others. Sixteen of the operations resulted in death.

CPR's fourth review phase was the preparation of a written report. Although it ordinarily did not make recommendations prior to the completion of the report, in this case the review team immediately recommended that Dr. Harris' surgical privileges at Bellin be suspended because the care rendered to his cardiac patients was unsafe. Consistent with this recommendation, the very next day Bellin's President, Mr. Thomas Arndt, told Dr. Harris that if he did not immediately resign all of his surgical privileges, thoracic and vascular as well as cardiac, they would be summarily suspended. Dr. Harris signed a letter in which he purported to resign these privileges voluntarily.

CPR's final report, made in June 1989, was consistent with the oral recommendations of the investigative team. It concluded that Dr. Harris was not providing patients under his care with an adequate level of judgment and technical ability. His surgical technique was different from those most commonly used, probably causing complications in several patients. His patients experienced excessive bleeding, and more than 76% of them experienced post-operative complications. Its final recommendation was that Bellin revoke Dr. Harris' cardiac privileges.

Dr. Harris was subsequently offered opportunities to meet with both the *ad hoc* committee and the CPR review team to discuss the final report, and was informed that he was entitled by the hospital's bylaws to a formal hearing. He declined the formal hearing but did meet with Mr. Hohol, Bellin's Vice President of Medical Staff Services, Mr. Arndt and two members of the CPR team, accompanied by both his attorney and Dr. Fergus. After a full-day meeting CPR issued a follow-up report that concluded that Dr. Harris was incapable of performing cardiac surgery safely. During this period the hospital conditionally reinstated plaintiff's vascular and thoracic privileges pending a review of those procedures. Although the review ultimately found that Dr. Harris was capable of performing vascular and thoracic surgeries, on February 20, 1990 he resigned those privileges as well. He never operated at Bellin after May 18, 1988.

Plaintiff eventually filed this suit in federal court based on diversity of the parties, alleging, *inter alia*, that Bellin breached its employment contract with him by revoking his surgical privileges without affording him the procedures required by the hospital's bylaws (Amended Complaint, Count One), and by undertaking a bad faith peer review of his surgical performance, also in contravention of its bylaws (Amended Complaint, Count Three). With respect to CPR, plaintiff alleged that it tortiously interfered with his contractual relationship with Bellin (Amended Complaint, Count Two).[1]

The defendants pleaded, among other things, the affirmative defense of qualified immunity. Both the Wisconsin peer review statute and federal law immunize from civil liability all participants in medical peer reviews that meet certain threshold conditions. Wis.Stat.Ann. § 146.37(1) (West 1989);[2] 42 U.S.C. § 11111(a). In its decision granting defendants' motion for summary judgment on the first three counts of plaintiff's Amended Complaint, the district court correctly determined that the federal statute is inapplicable in this case and analyzed defendants' claim to immunity only under the Wisconsin statute. Defendants now challenge that court's interpretation of 42 U.S.C. § 11111(a).

█ The federal statute, the Health Care Quality Improvement Act ("HCQIA"), applies to civil actions based on state law only when the professional review actions commenced on or after October 14, 1989, unless the state legislature elects to opt-in early to the HCQIA. 42 U.S.C. § 11111(c). The Wisconsin legislature did not opt-in early. Because "[t]he Hospital could be deemed to have commenced its review as early as October, 1988, when it enlisted Dr. Gifford's assistance in reviewing Dr. Harris' files," the district court held that the HCQIA did not apply to this suit. R. 52 at 19 n. 15.

Defendants argue that when the district court so held it did not have the benefit of *Austin v. McNamara*, 979 F.2d 728 (9th Cir.1992). That case held that "professional review actions" under the HCQIA "commence" not when the investigation itself commences but when "action" is taken with respect to the physician's privileges based on the investigation. *Id.* at 736–737. In that case, while the professional investigation commenced prior to the effective date of the HCQIA, the review of that investigation, which determined the status of plaintiff physician's continuing privileges, commenced three days after the effective date of the HCQIA. *Id.* at 732, 737. The *Austin* court therefore held that the HCQIA did operate to immunize the defendants from the physician's suit. *Id.* at 737.

This Court need not express an opinion as to whether peer review activity "commences" when the investigation itself commences, as the court below held, or when action is taken as a result of that investigation, as the *Austin* court held. In this case, even if the Court were to adopt the reasoning of the *Austin* court, the HCQIA still would not apply to Dr. Harris' suit. Dr. Harris was encouraged to resign his privileges at Bellin on May 18, 1989, the day after CPR conducted its on-site investigation and orally recommended that Dr. Harris' privileges be terminated. Clearly, under the reasoning of *Austin*, this is when action was first taken with regard to plaintiff's privileges at Bellin. Because the HCQIA does not apply to actions commenced in Wisconsin prior to October 14, 1989 it does not immunize defendants from Bellin's suit.

Defendants note that Dr. Harris could still appeal the May 18 action under the procedures provided by Bellin's bylaws, and that it was not clear as late as November 13, 1989 whether he was going to do so. For this

---

1. In addition, plaintiff alleged that Bellin unlawfully and in breach of his employment contract disclosed privileged information regarding his medical peer review (Amended Complaint, Counts Four and Five). The district court granted summary judgment in favor of the defendants on Counts One, Two and Three. By stipulation of the parties Counts Four and Five were dismissed with prejudice to enable plaintiff to pur-

sue this appeal of the summary judgment on Counts One through Three.

2. Section 146.37 was amended effective 1990 and subsection (1) was renumbered as Section 146.37(1g). The amendments do not affect the rights of the parties in this suit.

reason defendants would like the Court to hold that the HCQIA applies in this case. This would require an absurd extension of *Austin.* It might be that a peer review action commences only when the responsible body begins to review the results of a preliminary investigation, but this is a far cry from holding that a peer review action "commences" only when it finally ends.

Because the HCQIA does not apply to defendants' actions in this case, the issue before the Court is whether the Wisconsin peer review statute operates to immunize defendants from plaintiff's suit for breach of contract and tortious interference with contract. We hold that it does.

*Analysis*

The Wisconsin statute ("Peer Review Statute") provides that "[N]o person acting in good faith who participates in the review or evaluation of the services of health care providers ... is liable for any civil damages as a result of any act or omission by such person in the course of such review or evaluation." Wis.Stat.Ann. § 146.37(1) (West 1989). This statute affords defendants in cases arising out of medical peer reviews an affirmative defense to civil liability if the review was conducted in good faith. *Qasem v. Kozarek,* 716 F.2d 1172, 1179 (7th Cir.1983). The Court notes that the two cases directly interpreting the Peer Review Statute prior to the case at bar both dealt with claims for tortious interference and not with claims concerning breach of contract, *id.; Limjoco v. Schenck,* 169 Wis.2d 703, 486 N.W.2d 567 (App.), review denied, 491 N.W.2d 768 (Wis.1992), while in this case plaintiff's suit sounds in contract as well as in tort. Neither party to this suit has argued, however, that the statutory immunity does not extend to contract.

We proceed, therefore, on the assumption that even if Bellin breached a binding agreement to treat plaintiff differently than it did in the peer review, it is immune from suit if it acted in good faith.[3]

Additionally, the Peer Review Statute provides that "The good faith of any person specified in sub[ ]. (1) ... shall be presumed in any civil action. Any person who asserts that such a person has not acted in good faith has the burden of proving that assertion by clear and convincing evidence." Wis.Stat. Ann. § 146.37(1m) (West 1989). If this suit were to proceed to trial, then Dr. Harris would have the burden of proving by clear and convincing evidence that defendants did not conduct the peer review in good faith before his tort and contract claims could be considered. At summary judgment, however, he must demonstrate only that a rational jury could find that he had demonstrated lack of good faith by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2512.[4]

Good faith is not defined in the Peer Review Statute. The statute does direct the court to consider whether the participant in the review "has sought to prevent the health care provider ... and its counsel from examining the documents and records used in the review or evaluation, from presenting witnesses, establishing pertinent facts and circumstances, questioning or refuting testimony and evidence, confronting and cross-examining adverse witnesses or from receiving a copy of the final report or recommendation of the reviewing organization." Wis.Stat.Ann. § 146.37(2) (West 1989). These considerations are only factors, however, bearing on the issue of good faith. It is possible that defendants afforded plaintiff all of the procedural protections listed in the statute and yet

---

3. It is clear that both CPR and Bellin "participate[d] in the review or evaluation" of Dr. Harris and therefore fall within the terms of the Peer Review Statute. In this opinion the term "peer review" will include both CPR's formal review and Bellin's actions taken with respect to it. When it is necessary to distinguish CPR's actions from Bellin's, the opinion will refer to "CPR's review."

4. In this appeal plaintiff argues that the district court did not apply the proper summary judg-

ment standard, that it failed to resolve factual disputes in plaintiff's favor, and that it failed to draw all reasonable inferences in favor of the plaintiff. Because a grant of summary judgment is reviewed *de novo* this Court need not scrutinize the district court's reasoning as closely as plaintiff urges. In cases where he makes a plausible argument that the district court failed to resolve factual disputes and draw reasonable inferences in his favor, this opinion reflects the facts and inferences urged by plaintiff.

did not act in good faith. *Qasem*, 716 F.2d at 1178.

In this case, the formal hearing that Bellin offered Dr. Harris after he "voluntarily" resigned his privileges in May 1989, and that he declined, included the procedural protections listed in the Peer Review Statute. This Court must therefore look elsewhere for evidence that the defendants did not act in good faith with respect to plaintiff. See *Qasem*, 716 F.2d at 1180 (noting that plaintiff in that case had failed to take advantage of the internal review process available to him under the defendant hospital's bylaws, and implying that offering plaintiff those procedures was an indication that the hospital had acted in good faith).

Only two cases have directly interpreted the Wisconsin Peer Review Statute. *Qasem* established that a peer review might be conducted otherwise than in good faith even if the statutory procedures are afforded the reviewee, but did not directly address what other factors a court should consider as bearing on good faith. 716 F.2d at 1177–1178. *Limjoco* established that the defendants' motives in conducting the peer review are relevant to the inquiry. 169 Wis.2d 703, 486 N.W.2d 567. In that case the plaintiff attempted to rebut the statutory presumption of good faith by alleging that the peer reviewers had a grudge against him and that they stood to gain financially if he were removed from the clinic at which he practiced. *Id.* at 713, 486 N.W.2d 567. The court treated this as an acceptable argument addressing the issue of good faith, but held that the plaintiff had not supported his claims with enough evidence to withstand the defendants' motion for summary judgment. *Id.* at 713–715, 486 N.W.2d 567.

Other courts interpreting peer review statutes similar to Wisconsin's have also held that "good faith" is at least in part a subjective inquiry. See, *e.g.*, *Campbell v. St. Mary's Hospital*, 312 Minn. 379, 388–389, 252 N.W.2d 581, 586–587 (1977); *Gilbert v. Board of Medical Examiners*, 155 Ariz. 169, 178, 745 P.2d 617, 626 (App.1987); *Scappatura v.*

*Baptist Hospital of Phoenix*, 120 Ariz. 204, 210, 584 P.2d 1195, 1201 (App.1978). While the statutes at issue in these cases both had an explicit "malice" provision that is lacking in the Wisconsin statute, *Qasem* treated them as being relevantly similar to Wisconsin's Peer Review Statute for the purpose of determining its "legal effect." 716 F.2d at 1176–1177.

■ In the case at bar plaintiff relies on several alleged defects in CPR and Bellin's peer review to support his claim that defendants did not act in good faith.[5] Plaintiff complains that CPR neglected to perform a statistical analysis on his mortalities in order to determine the effect of his patients' risk factors on the mortality rate. He notes that Bellin asked CPR to include two of his 1989 mortalities in its review, after CPR had determined to review only his 1988 cases. He raises other issues regarding the adequacy of CPR's on-site visit. In addition, he argues that Bellin ought not to have suspended (or required him "voluntarily" to resign) his thoracic and vascular privileges following CPR's review of his cardiac practice, and that Bellin failed to afford him all of the procedures to which he was entitled under its bylaws.

If plaintiff's argument is that a peer review must be perfect in order to have been conducted in good faith, clearly his argument fails. An imperfect peer review could, however, constitute evidence from which a factfinder could infer lack of good faith. On the one hand, a peer review might be so deficient that lack of good faith could be inferred simply from the conduct of the review itself. On the other hand, even if a review did not sink to such depths, an inference of lack of good faith could be made if the plaintiff would adduce some additional evidence to show that defendants did not conduct themselves in good faith.

Surely a plaintiff could meet this burden in a number of ways. In this case Dr. Harris has attempted to demonstrate that the defendants had an improper motive in conducting the review of his surgeries. He speculates

---

5. Plaintiff's briefs do not reliably distinguish his claims against Bellin from his claims against CPR. Wherever possible this opinion interprets plaintiff's arguments as advanced against both parties.

that raw numbers reflecting Bellin's high mortality figures published by the United States Department of Health and Human Services' Health Care Financing Administration ("HCFA") might alarm the public and affect Bellin's bottom line. Rather than explaining that these figures reflect its surgeons' patient population, he argues, Bellin preferred to remove his statistics from the equation by trumping up a reason to terminate him.

This argument is similar to one raised in *Limjoco*, 169 Wis.2d 703, 486 N.W.2d 567. In that case the plaintiff alleged lack of good faith on the part of peer reviewers based on a claim that they had a grudge against him and that they stood to gain from his departure from the clinic at which he worked because more patients would be referred to them. This claim, although supported by some deposition testimony, was held not to defeat defendants' motion for summary judgment. "[T]his deposition testimony is not enough to raise an inference that a grudge or vendetta exists." *Id.* at 713–714, 486 N.W.2d 567. In the case at bar plaintiff has offered almost no deposition testimony in support of his position.[6] He only offers the HCFA figures and urges this Court to infer that Bellin would improperly terminate him in order to improve them. In *Limjoco* the court "conclude[d] that Limjoco fail[ed] to make the Schencks' good faith a disputed issue of fact because he offer[ed] only conclusory statements about the grudge and the Schencks' economic gain. He [did] not present established facts from which inferences of bad faith could be drawn." *Id.* at 714–715, 486 N.W.2d 567. This Court likewise holds that plaintiff's conclusory statements are insufficient to raise a genuine issue as to defendants' motives.

Because plaintiff has not raised a genuine issue concerning defendants' motives, he has failed to adduce any evidence that, taken together with his allegations of an imperfect peer review, would support his claim that defendants did not act in good faith. Therefore, unless CPR's review and Bellin's actions regarding it were so deficient that standing alone they would allow an inference of lack of good faith, plaintiff's argument must fail.

In support of his claim that defendants did not act in good faith in reviewing his surgical performance, plaintiff places the most reliance on defendants' failure to perform any statistical analysis on his seemingly high (three to four times the national average) mortality rates. Plaintiff argues that his patients were at higher risk of post-operative complications and death than the general patient population, but that the defendants did not properly take this into account. In particular, plaintiff believes that a formal statistical analysis ought to have been performed on the "raw data" (comparing his mortality rate to the national average). He notes that the *ad hoc* committee that requested an outside evaluation of his performance specifically asked that a statistician be included in the review team, and that Dr. Fergus informed the hospital that in order to evaluate Dr. Harris' surgeries properly, his high-risk patient population had to be considered and stratified.

It is not clear, however, what information a statistical analysis would have conveyed to the CPR team, in part because during this litigation plaintiff has offered no statistical analysis of his own. According to the defendants, Bellin's *ad hoc* committee requested that a statistician be included on the outside review team because it believed that a statistical analysis of Dr. Harris' cases would help to determine whether his mortality rates were due to the nature of his patient population or rather due to his own surgical skills and techniques. The employees of CPR, however, whose business was medical peer review, determined that a statistical analysis would not be helpful in evaluating Dr. Harris' cases.[7] Plaintiff disputes, in conclusory

6. He does offer a conversation between Dr. Fergus and Mr. Hohol, which occurred after plaintiff had already ceased his surgical practice at Bellin, in which Mr. Hohol apparently was concerned that the hospital's overall surgical mortality rates were higher than the national average. R. 51, Exhibit E at 115–118.

7. CPR also alleges that its team did take risk factors into account in evaluating Dr. Harris' cases, but that it did so on an informal, case-by-case basis. CPR's final report acknowledged the high risk factors inherent in Dr. Harris' patient

terms, whether CPR was correct about this but attempts no explanation of what such an analysis would have revealed. In the absence of any evidence that such an analysis would even have been helpful to defendants, let alone crucial to a fair evaluation of his surgical skills, plaintiff's mere desire that the review would have been conducted differently does not support an inference that defendants lacked good faith.

Plaintiff additionally relies on the inclusion of two 1989 mortalities in CPR's on-site review to show defendants' lack of good faith. CPR had initially selected plaintiff's 1988 surgeries as the time frame to be reviewed, yet when the review team arrived at Bellin the hospital requested it to review the charts on two 1989 surgical mortalities. Plaintiff argues that these mortalities were "hand picked" by Bellin to make him look bad. Bellin responds that these deaths occurred after plaintiff had agreed not to operate on high-risk cardiac patients, and that it wanted CPR to evaluate whether Dr. Harris was acting in contravention of the agreement.

Because plaintiff has not countered Bellin's plausible explanation with anything but a bare allegation of misconduct, the Court cannot infer lack of good faith from this evidence. In addition, the inclusion of this data could not have affected the outcome of CPR's investigation. As the district court noted, plaintiff's overall mortality rate was in excess of 20 percent whether or not the two out-of-sequence mortalities were included. "[I]t is simply not logical to conclude that because the CPR team knew about two more of Dr. Harris' mortalities, their review was prejudiced." R. 52 at 32.

Plaintiff notes also that CPR only evaluated his cardiac surgeries, not his thoracic and vascular surgeries, and yet Bellin required him to resign not only his cardiac but also his thoracic and vascular privileges. When a review of his thoracic and vascular performance was finally made, there was found to be no reason to deny him those privileges. He argues that this is evidence of lack of good faith on Bellin's part. Bellin responds that vascular and thoracic surgeries may ultimately involve the great vessels of the heart, and that having just been informed that Dr.

Harris was using questionable techniques in cardiac surgery, it elected to err on the side of caution in requesting him to refrain from performing related surgeries until a review of his thoracic and vascular performance could be undertaken. Furthermore, shortly after plaintiff's forced resignation of his vascular and thoracic privileges Bellin reinstated them, at his request, pending a review. This behavior is not indicative of lack of good faith.

In addition, plaintiff makes the following points in support of his contention that the peer review was not conducted in good faith: (1) Plaintiff's expert, Dr. Mayer, contends that the one day spent by CPR in reviewing charts on 67 patients was completely inadequate, and that at a minimum one hour per chart was necessary to draw the proper conclusions from them. (2) Plaintiff alleges that Dr. Fergus was uniquely qualified, as the referring physician for most of Dr. Harris' high-risk patients, to explain the circumstances surrounding their surgeries, yet CPR did not interview him and Bellin was aware of that. (3) CPR's team met with Dr. Harris only briefly during its on-site investigation. He alleges that he was discouraged from preparing for the interview or bringing records to the meeting. (4) Plaintiff argues that informing CPR that only one surgeon was to be evaluated inclined the team to find fault with his performance.

The Court notes that the procedures offered by Bellin gave Dr. Harris the opportunity to remedy many of the alleged defects in CPR's review. Dr. Fergus was present during the day-long meeting between Dr. Harris, his attorney, two members of the CPR team, and Messrs. Arndt and Hohol. At that meeting Dr. Harris also was able to explain his interpretation of the cases previously examined by the CPR team. Had plaintiff availed himself of all of the processes offered by Bellin, he would have had additional opportunities to correct any errors made in the initial review. In light of this, the Court cannot infer lack of good faith from defendants' conduct of the on-site portion of CPR's review.

Plaintiff also argues that Bellin's failure to follow all the procedures set forth in its

population but concluded that this did not ex-

plain his unusually high mortality rate.

bylaws is evidence that it failed to act in good faith. He alleges that he became entitled to "due process" under Bellin's bylaws as early as April 1989, when Dr. Martin asked him to refrain from operating on high-risk patients, but that the process to which he was entitled was not always afforded him. In particular Dr. Harris alleges that Mr. Arndt took unilateral action in encouraging him to resign his surgical privileges following the CPR review, in contravention of Bellin's bylaws requiring Mr. Arndt to consult with the hospital's Executive Committee before restricting a physician's practice. Once again, however, this Court notes that Bellin for the most part did follow its own bylaws, that it offered plaintiff many more procedures than he actually utilized, and that those procedures comported with the factors listed in the Peer Review Statute as indicative of good faith.

None of plaintiff's allegations, taken individually or in the aggregate, would allow a reasonable jury to conclude that Bellin and CPR did not conduct themselves in good faith. At best, plaintiff has demonstrated that there is a triable issue of fact as to whether CPR's investigation might have been conducted more thoroughly. But an imperfect investigation does not in itself constitute one that was conducted in bad faith, and defendants' actions clearly do not sink to such a level that lack of good faith could be inferred solely from the conduct of the peer review. Because plaintiff's allegations that defendants had a motive to skew the peer review against him are unsupported by any credible evidence, he has failed to meet his burden of demonstrating that a reasonable jury could find that the defendants did not act in good faith.

The court below, referring to peer review statutes similar to Wisconsin's, concluded that "bad faith" in the context of a peer review is "a primary purpose other than the safeguarding of patients." R. 52 at 21, citing *Scappatura*, 120 Ariz. at 210, 584 P.2d 1195; accord *Gilbert*, 155 Ariz. at 178, 745 P.2d 617. In this case it is clear that Bellin reasonably perceived Dr. Harris to pose a threat to its patients, and that defendants' primary purpose throughout the conduct of the peer review was safeguarding them. The decision below is affirmed.

FLAUM, Circuit Judge, concurring.

I join this court's judgment and opinion affirming the district court. I write separately only to express some concern as to what I perceive to be a possible lack of thoroughness on the part of the defendants. Raw percentages alone are relatively meaningless without a sophisticated statistical analysis. We should be wary of creating incentives for physicians to abandon high-risk patients by our drawing unwarranted inferences from raw numerical data. However, like the court, I question why with all plaintiff's allegations he has offered no statistical analysis of his own. *See* Opinion of the Court, *ante* p. 1087. While noting that performing a proper statistical analysis would have substantially strengthened defendants' good faith defense, I cannot find this defect alone as sufficient indication that defendants lacked "good faith" absent any further evidence by plaintiff. Therefore, recognizing that defendants certainly could have improved their investigation of Dr. Harris, their actions appear to meet, albeit marginally, the standard presented by the State's statutory presumption of good faith.