ESTATE OF Judy A. HAMMERSLEY, Estate of Nicholas A. Hammersley, By William L. Hammersley, Sr., Special Administrator, William L. Hammersley, Sr. and Mary Hammersley, Plaintiffs-Appellants,†

v.

WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION, Dawn Pabich and Oconto County, Defendants-Respondents,

William L. HAMMERSLEY, Jr. and DEF Insurance Corporation, Defendants.

Court of Appeals

*No. 2011AP359. Submitted on briefs January 17, 2012. —Decided March 6, 2012.*

2012 WI App 44

(Also reported in 811 N.W.2d 878.)

† Petition for Review filed.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Rachel L. Bachhuber* and *Bruce R. Bachhuber* of *Hanaway Ross, S.C.*, Green Bay.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Andrew P. Smith* of *O'Melia, Schiek & McEldowney, S.C.*, Rhinelander.

Before Hoover, P.J., Peterson and Mangerson, JJ.

¶ 1. MANGERSON, J. On June 16, 2005, William Hammersley, Jr. (Hammersley), a twenty-nine-year-old schizophrenic, killed his mother, Judy Hammersley, and his nephew, Nicholas Hammersley. The day before, a police deputy had requested assistance from Dawn Pabich, a licensed Oconto County social worker, in determining whether further action was necessary to address Hammersley's erratic behavior. After speaking with Pabich, the deputy decided against initiating an emergency detention.

¶ 2. We are asked to decide whether licensed clinical social workers assisting law enforcement officers with emergency detention decisions under Wis.

STAT. § 51.15 are immune from civil liability for actions taken in good faith.[1] We are also asked to determine whether, based on the undisputed facts in this case, Pabich was acting in good faith when evaluating whether Hammersley met the emergency detention criteria. We answer both questions in the affirmative and affirm.

## BACKGROUND

¶ 3. Oconto County emergency dispatch received a call from Hammersley. He stated that he had used his family's shotgun to kill his mother and nephew, under the direction of the devil and then-President George Bush. Rescue personnel responded and confirmed that Judy and Nicholas were dead.

¶ 4. In 2001, four years before the killings, Pabich, a licensed clinical social worker with Oconto County Health and Human Services, had evaluated Hammersley. Pabich, who had extensive training and experience in dealing with mental illness, wrote that Hammersley appeared depressed and had spoken about killing himself. Hammersley was referred to Dr. Edward Orman, who diagnosed him with schizophrenia with auditory hallucinations and major depression. Hammersley was prescribed several medications and his condition stabilized.

¶ 5. The days immediately preceding the killings were filled with turmoil. Hammersley was arrested for disorderly conduct (as domestic abuse) on June 11, 2005. He was living with his girlfriend, Jennifer, in Green Bay at the time. According to Jennifer, Hammersley acted strangely and refused to take his medication. When she

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

tried to call Judy, Hammersley pinned Jennifer in a recliner, opened her eyes with his fingers, and proclaimed that he could see the devil and that he would "gouge [her] fucking eyes out." Jennifer was able to summon the police, though Hammersley subsequently ripped both the phone and answering machine out of the wall.

¶ 6.  Hammersley's parents visited him in jail that day. Police informed them that Hammersley would not be transferred to a mental health facility because the domestic abuse charge "took precedence" over any mental illness. After Hammersley agreed to take his medication, his parents posted bail and they all returned to the family home in Oconto County.

¶ 7.  Over the next several days, Hammersley displayed increasingly erratic behavior. According to his father, Hammersley paused in a grocery store to look at a magazine with President Bush on the cover. When asked, Hammersley stated that he was "looking to see if he has the devil in him."

¶ 8.  The next day, June 13, Hammersley again exhibited strange behavior and refused to take his medication. His father called Dr. Orman, who advised him to call the police and have Hammersley taken to the Brown County Mental Health Center. Deputy Bradley Paitl interviewed Hammersley, but left to respond to an emergency after Hammersley agreed to take his medication. Paitl called later for an update, but stated that his "hands [were] tied" and he could not forcibly medicate Hammersley. Fearing that Hammersley would flee, his parents hid the keys to their vehicles; this prompted Hammersley to attempt to start a tractor with a screwdriver.

¶ 9.  Hammersley went missing the following morning. Judy called Oconto County dispatch and said that she believed he was walking to Green Bay to get his

561

truck. Deputy Chad Angus was dispatched to the Hammersley residence. Judy told Angus that Hammersley was off his medications and had asked to use a gun for target practice the day before. She acknowledged he had not threatened to hurt himself or anyone else with the weapon.

¶ 10. Deputy Paitl located Hammersley about two miles from his home, walking on the side of the road. Hammersley stated he had gone to Lena to get a drink of water, a four and one-half hour walk from the residence. Paitl took Hammersley home, where Hammersley maintained he had "done nothing wrong." Deputy Angus, who was still at the house, paged Oconto County Health and Human Services and told Pabich of the situation. Pabich attempted to speak with Hammersley, but he refused and asserted he was fine. She then spoke with Judy, who disclosed that Hammersley had been arrested for domestic abuse involving his girlfriend. However, Judy did not disclose the details of the incident despite Pabich's repeated requests. Judy also told Pabich that Hammersley had tried to access the family's guns, but stated this was not unusual as the family often engaged in recreational shooting. Ultimately, Angus determined there was insufficient evidence of dangerousness to initiate an emergency detention under Wis. Stat. § 51.15.

¶ 11. The senior William Hammersley, Mary Hammersley, and the Estates of Judy and Nicholas Hammersley (collectively, the Estates) commenced this negligence action against Pabich and others. Pabich moved for summary judgment, which the circuit court granted on the basis of the immunity provision contained in Wis. Stat. § 51.15(11).[2]

---

[2] It appears from the transcript of the summary judgment hearing that the parties agreed to hold their remaining claims in abeyance pending the outcome of this appeal.

## DISCUSSION

¶ 12.   We review a grant of summary judgment de novo, applying the same methodology as the circuit court. *H & R Block E. Enters. v. Swenson*, 2008 WI App 3, ¶ 11, 307 Wis. 2d 390, 745 N.W.2d 421. A party is entitled to summary judgment if there are no disputed issues of material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2).

¶ 13.   Emergency detentions are governed by WIS. STAT. § 51.15. Law enforcement officers and certain other officials are empowered to take into custody any person who officers determine is mentally ill, drug dependent, or developmentally disabled, and who exhibits a substantial probability of physical harm. *Kell v. Raemisch*, 190 Wis. 2d 754, 756, 528 N.W.2d 13 (Ct. App. 1994); *see also* WIS. STAT. § 51.15(1)(a). This section strikes a delicate balance between the need to protect the public, *Schuster v. Altenberg*, 144 Wis. 2d 223, 234, 424 N.W.2d 159 (1988), and the liberty interests protected by due process, *Dane Cnty. v. Stevenson L.J.*, 2009 WI App 84, ¶ 11, 320 Wis. 2d 194, 768 N.W.2d 223.

¶ 14.   The legislature has recognized that determining whether an individual is a candidate for emergency detention is an inexact science. WISCONSIN STAT. § 51.15(11) protects against liability for actions taken in good faith by individuals "act[ing] in accordance with [§ 51.15], including making a determination that an individual has or does not have mental illness or evidences or does not evidence a substantial probability of harm . . . ." Whether an individual is entitled to the protections of § 51.15(11) is a question of law which we review de novo. *Kell*, 190 Wis. 2d at 758.

563

¶ 15. To determine whether Pabich is eligible for immunity, we must construe Wis. Stat. § 51.15(11). Statutory interpretation and application present questions of law. *MercyCare Ins. Co. v. Wisconsin Com'r of Ins.*, 2010 WI 87, ¶ 26, 328 Wis. 2d 110, 786 N.W.2d 785. Statutory interpretation " 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' " *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting *Seider v. O'Connell*, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659).

¶ 16. A threshold requirement for immunity is that an individual act "in accordance" with Wis. Stat. § 51.15. Although the legislature did not precisely define when this occurs, it did give some helpful examples. An individual "acts in accordance with [§ 51.15]" when "making a determination that an individual has or does not have mental illness or evidences or does not evidence a substantial probability of harm . . . ." Wis. Stat. § 51.15(11). Thus, an individual determining in good faith whether a person meets the criteria for emergency detention under § 51.15(1)(a) is eligible for immunity.

¶ 17. Pabich's actions here fall within the plain language of the statute. According to the undisputed facts, Pabich aided Angus in determining whether Hammersley was a proper subject for emergency detention. Specifically, Pabich stated that her primary task was to evaluate whether Hammersley suffered from a mental illness. She also assisted Angus in assessing whether Hammerlsey was dangerous. Accordingly, Pabich is immune if her actions were taken in good faith.

¶ 18.   The Estates urge us to adopt a restrictive interpretation of Wɪs. Stat. § 51.15(11) that would immunize only those officials authorized to initiate an emergency detention. This class of officials includes a "law enforcement officer or other person authorized to take a child into custody under ch. 48 or to take a juvenile into custody under ch. 938." Wɪs. Stat. § 51.15(1)(a). The Estates contend that the scope of immunity should not extend beyond those authorized to take an individual into physical custody. Pabich is not such an official.

¶ 19.   However, the Estates have failed to describe a meaningful nexus between the eligible classes under Wɪs. Stat. § 51.15(1)(a) and (11). We interpret statutory language in the context it is used and in relation to the language of surrounding or closely related statutes. *Kalal*, 271 Wis. 2d 633, ¶ 46. The legislature was very specific when describing those officials authorized to take individuals into physical custody. *See* Wɪs. Stat. § 51.15(1)(a). It was similarly specific throughout § 51.15, using the same "law enforcement officer or other person" language when describing who must transport the detainee and complete a statement of emergency detention. *See* Wɪs. Stat. § 51.15(2), (4)(a), (5). The Estates would have us believe that the legislature, having used identical language to describe the group four times previously, suddenly shifted course in subsection (11), but intended the same meaning. That is implausible. By granting immunity to *any* individual "act[ing] in accordance with [§ 51.15]," the legislature plainly intended to expand immunity beyond those authorized to take individuals into physical custody. Contrary to the Estates' assertion, the language in

subsection (11) cannot be read as a "shorthand reference" to the groups authorized to take physical custody of detainees.

¶ 20. This interpretation avoids the absurd and unreasonable results that would follow from a narrow reading of WIS. STAT. § 51.15(11). *See Kalal,* 271 Wis. 2d 633, ¶ 46 (absurd and unreasonable results to be avoided when construing statutes). The ultimate determination whether to detain an individual rests with law enforcement officials, but they are not prohibited from consulting others when making this important decision. According to Pabich, law enforcement officers in the Oconto County Sheriff's Department generally do not possess the education, experience, and specialized training of licensed clinical social workers. We suspect this is true throughout the state. It would be absurd to immunize the officials responsible for formally taking a person into custody, but not the people upon whose advice they regularly rely. Further, trained mental health professionals should not be discouraged, because of civil liability, from providing predetention advice to officers. To do so increases the risk of inaccurate assessments.[3]

¶ 21. In arguing that Pabich was not acting in accordance with WIS. STAT. § 51.15, the Estates take their cue from the successful appellants in *Kell,* but their analogy is fundamentally flawed. In *Kell,* Vincent

[3] The Estates contend that a construction that "creates a limited immunity only to those authorized to initiate proceedings that deprive liberty is consistent with the principle of strict adherence to stringent procedural requirements and the necessity for narrow, precise standards." To the contrary, we perceive a greater risk of erroneous liberty deprivations if licensed mental health experts decline to assist law enforcement officials for fear of liability.

Mott was arrested for assaulting his girlfriend. *Kell*, 190 Wis. 2d at 756. He was released on bond, but a court commissioner ordered that he be held in jail for a psychological evaluation. *Id.* at 757. Prudencio Oyarbide, a clinical specialist with Dane County Mental Health Center, evaluated Mott and concluded he did not suffer from a mental illness. *Id.* at 757. Mott was released and, approximately one month later, shot and stabbed his girlfriend. *Id.*

¶ 22. Though factually similar, *Kell* was not a WIS. STAT. § 51.15 case. Oyarbide and the Center successfully argued to the circuit court that they were entitled to WIS. STAT. § 51.15(11) protection. *Id.* However, we concluded that none of § 51.15's provisions, including subsection (11), applied because Mott was not evaluated in connection with an emergency detention. *Id.* at 758–60. He was already in custody when he was interviewed, and any petition subsequent to the examination would have been filed under WIS. STAT. § 51.20. *Id.* at 758–59. *Kell* provides little guidance here because Hammersley was not in custody and the emergency detention procedures described in § 51.15 were applicable.

¶ 23. To the extent *Kell* is at all relevant to this appeal, it tends to cut against the Estates' position. Chief Judge Eich, believing that Oyarbide's evaluation was in connection with a WIS. STAT. § 51.15 emergency detention, dissented and would have reached the question of whether Oyarbide was eligible for immunity under WIS. STAT. § 51.15(11). *Id.* at 760–62. Judge Eich interpreted the immunity provision exactly as we have:

> It would be anomalous to read the statute as providing immunity to the person—the law enforcement officer —who takes physical custody of the individual, while rendering the person who decides whether to initiate

> the proceedings leading up to that action—or, as here, determines not to initiate them—subject to suit for that act.

*Id.* at 762. Citing the plain language of subsection (11), Judge Eich concluded that Oyarbide was "acting in accordance" with § 51.15 when evaluating Mott as a subject for emergency detention. *Id.* With the meaning of this subsection now squarely before us, we agree with Judge Eich's analysis.

¶ 24. Our reading of WIS. STAT. § 51.15(11) is consistent with prior interpretations of a similar statute governing immunity in the context of medical peer reviews. WISCONSIN STAT. § 146.37(1g) immunizes any person "acting in good faith who participates in the review or evaluation of the services of health care providers or facilities . . . conducted in connection with any program organized and operated to help improve the quality of health care . . . ." As with the good faith presumption under § 51.15(11), any person asserting a lack of good faith under § 146.37 must prove that assertion by clear and convincing evidence. WIS. STAT. § 146.37(1m). In *Rechsteiner v. Hazelden*, 2008 WI 97, ¶¶ 74–75, 313 Wis. 2d 542, 753 N.W.2d 496, the plaintiff physician argued that § 146.37(1g) did not immunize anyone but his employer's board of directors, who had initiated the peer review. Our supreme court rejected that argument, noting that the legislature broadly immunized any person participating in the peer review in good faith. *Id.*

¶ 25. The Estates find some significance in the fact that, unlike some other statutory schemes, WIS. STAT. ch. 51 does not explicitly adopt a liberal construction.[4] We do not share their view. The legislature wrote

---

[4] The Estates cite 1983 Wis. Act. 418, § 1, which states the legislation "should be liberally construed in favor of property owners to protect them from liability."

what it wrote. The plain language of WIS. STAT. § 51.15(11) governs this case. For this reason, we are also not persuaded by the Estates' argument that our interpretation is contrary to the rule that statutes in derogation of the common law are strictly construed. *See Pearson v. School Dist. No. 8*, 144 Wis. 620, 623, 129 N.W. 940 (1911).

¶ 26.   The Estates also attempt to show that their interpretation of WIS. STAT. § 51.15(11) is widely held. If some mental health professionals are eligible for immunity, they argue, then the professionals in *Gordon v. Milwaukee County*, 125 Wis. 2d 62, 370 N.W.2d 803 (Ct. App. 1985), and *Schuster* would surely have raised § 51.15(11) as a defense to their alleged liability. This argument is at best tenuous. Our interpretive task does not depend on litigation strategies employed in other cases, particularly where a statute is clear on its face. *See Kalal*, 271 Wis. 2d 633, ¶ 50 (no need to consult extrinsic sources unless the statute is ambiguous). Further, neither case involved an examination in connection with a § 51.15 emergency detention.[5]

---

[5] In *Gordon v. Milwaukee County*, 125 Wis. 2d 62, 64–65, 370 N.W.2d 803 (Ct. App. 1985), the patient had already been detained and admitted to the Milwaukee County Mental Health Complex for examination. The pertinent issue in *Schuster v. Altenberg*, 144 Wis. 2d 223, 226, 234, 424 N.W.2d 159 (1988), was whether the plaintiff had adequately pled a negligence claim against a psychotherapist for failure to warn or to seek commitment.

There is some tension between *Schuster* and WIS. STAT. § 51.15. *Schuster* states that a psychiatrist is negligent if "it would have been foreseeable . . . that by failing to warn a third person or by failing to take action to institute [emergency] detention or commitment proceedings someone would be

569

¶ 27. The Estates next assert that, even if Pabich is eligible for immunity under WIS. STAT. § 51.15(11), a genuine issue of material fact exists as to whether her evaluation was made in good faith. Subsection (11) presumes that a person participating in emergency detention decisions has acted in good faith. This presumption can be defeated only by "clear, satisfactory and convincing" evidence to the contrary. *Id.*

¶ 28. Because this case was decided on summary judgment, in reviewing the evidence presented below, we draw all reasonable inferences in favor of the nonmoving party. *H & R Block*, 307 Wis. 2d 390, ¶ 11. If more than one reasonable inference may be drawn from undisputed facts, the competing reasonable inferences may constitute genuine issues of material fact. *Id.* "Whether an inference is reasonable and whether more than one reasonable inference may be drawn are questions of law." *Id.* Here, the Estates must show by clear and convincing evidence only that "a rational jury could find that [Pabich] had demonstrated lack of good faith." *Harris v. Bellin Mem'l Hosp.*, 13 F.3d 1082, 1086 (7th Cir. 1994); *see also Limjoco v. Schenck*, 169 Wis. 2d 703, 713, 486 N.W.2d 567 (Ct. App. 1992) (under peer review statute, plaintiff "simply had to present facts or alternate competing inferences sufficient to convince the trial court that there was a triable dispute regarding . . . good faith").

---

harmed . . . ." *Schuster*, 144 Wis. 2d at 240. Presumably, the *Schuster* court meant that a psychiatrist may have a duty to notify police if they suspect that a patient might meet the criteria under § 51.15. Law enforcement and other similar officers are the only individuals granted authority to take physical custody of a person eligible for emergency detention. *See* WIS. STAT. § 51.15(1)(a).

¶ 29. What constitutes "good faith" under WIS. STAT. § 51.15(11) appears to be a matter of first impression. We give statutory language its common, ordinary, and accepted meaning. *Kalal*, 271 Wis. 2d 633, ¶ 45. "Good faith" can be defined as "a state of mind indicating honesty and lawfulness of purpose." WEBSTER'S THIRD NEW INT'L DICTIONARY 978 (unabr. 1993). It can also be read to require a belief "that one's conduct is not unconscionable or that known circumstances do not require further investigation." *Id.* Finally, "good faith" can mean "absence of fraud, deceit, collusion, or gross negligence." *Id.*

¶ 30. Again, WIS. STAT. § 146.37 is instructive. In *Harris*, 13 F.3d at 1085, a doctor who performed high-risk surgeries brought suit against his former employer, alleging a bad faith peer review of his surgical performance. The *Harris* court noted that a peer review need not be perfect. *Id.* at 1087. The same is true of emergency detention evaluations. However, "a peer review might be so deficient that lack of good faith could be inferred simply from the conduct of the review itself." *Id.* On the other hand, even an appropriate review could give rise to an inference of lack of good faith if the plaintiff adduces some additional evidence. *Id.*

¶ 31. The Estates have not claimed here that Pabich acted dishonestly, or that her actions were fraudulent or deceitful. Nothing in the record suggests that Pabich was motivated by anything other than a desire to assist Angus in performing his duties under WIS. STAT. § 51.15. The Estates' sole assertion is that Pabich's evaluation was inadequate and that her analysis, given the facts known to her at the time, was so grossly negligent as to create a triable issue regarding Pabich's good faith.

¶ 32. The Estates point to an expert report prepared by Dr. Kenneth Robbins in connection with this litigation. Robbins opined that Pabich "did not meet the most minimal standards for a mental health professional asked to assist a police officer in the evaluation of a potentially dangerous person with a mental illness." Robbins concluded that Pabich misinterpreted the risk factors present and should have investigated further. He also asserted that a "face-to-face interview was clearly appropriate and necessary based on the preliminary information Ms. Pabich learned over the phone."

¶ 33. Robbins' report is an attempt to create an inference of a lack of good faith from the undisputed facts, but we are not persuaded. No reasonable factfinder could conclude, on these facts, that Pabich's investigation was so lacking, or her conduct so grossly negligent, to give rise to an inference of a lack of good faith. *See Harris*, 13 F.3d at 1088 (claim of malice in connection with peer review, though supported by some deposition testimony, was insufficient to defeat summary judgment motion); *Limjoco*, 169 Wis. 2d at 713–15 (same).

¶ 34. In reviewing the undisputed facts, we are mindful that Pabich was effectively asked to predict the future. But we do not live in a MINORITY REPORT society,[6] and no one can be held to a standard requiring them to predict what will happen tomorrow with 100% accuracy. Even *Schuster* recognized this principle. *See Schuster*, 144 Wis. 2d at 245–46 (quoting *Tarasoff v. Regents of the Univ. of Cal.*, 551 P.2d 334, 345 (Cal. 1976)) ("Obviously we do not require that the therapist, in [attempt-

---

[6] In the film MINORITY REPORT (Twentieth Century Fox 2002), a trio of seers known as "Pre-Cogs" predict violent crimes before they occur. Ultimately, the law enforcement system built upon these fortune tellers is revealed to be fallible.

ing to forecast whether a patient presents a serious danger of violence], render a perfect performance; the therapist need only exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed . . . by members of [that professional specialty] . . . .' "). While the short-term focus of the emergency detention criteria may allow mental health professionals to more accurately predict patient behavior within certain limitations, expert witnesses reviewing a mental health professional's performance may still be prone to make "retrospective pronouncements based on their own ideologies . . . ." Robert D. Miller et al., *Psychotherapists' Duty to Prevent Foreseeable Harm:* Schuster v. Altenberg, WISCONSIN LAWYER, May 1989, at 10, 68–69; *but see* Fay Anne Freedman, *The Psychiatrist's Dilemma: Protect the Public or Safeguard Individual Liberty?,* 11 U. PUGET SOUND L. REV. 225, 277–79 (1988) ("[W]ithin the psychiatric field, serious doubt exists concerning the expertise in predicting dangerous behavior.") With that, we turn to the undisputed facts.

¶ 35. During her ten-minute interview with Deputy Angus, Judy, and Hammersley, Pabich had no trouble concluding Hammersley was mentally ill.[7] Pabich attempted to talk to Hammersley, but he did not want to speak with her and refused to take his medication or go to a doctor. Pabich then asked to speak to

---

[7] For this reason, the Estates' emphasis on Hammersley's nonthreatening erratic behavior—like walking four and one-half miles for a drink of water—is misplaced. There was no question at the time of Pabich's evaluation that Hammersley was mentally ill. The real dispute was whether Hammersley was dangerous. As Pabich cogently observed at her deposition, she could not "recommend that [Hammersley is] a danger and . . . can be locked up for walking down the side of a road to get a drink."

Judy to get additional information. Judy told Pabich of the recent domestic abuse and restraining order, but Judy did not provide details when Pabich asked.

¶ 36. The Estates assert that Pabich's failure to learn additional details of Hammersley's domestic abuse arrest evidences her lack of good faith. We cannot agree. Pabich stated at her deposition that she asked Judy many times for details of the arrest, including whether Hammersley had threatened or harmed anyone. Despite her repeated questioning, no one disclosed that Hammersley had become physically violent with his girlfriend, claimed to see the devil in her, or threatened to gouge her eyes out and kill her. Given Judy's reluctance to divulge the details of the incident, it appears the only way Pabich could obtain this information was by hunting down the Brown County police report herself. That task, while perhaps advisable in retrospect, was not necessary to satisfy Pabich's duty to conduct a reasonably adequate investigation.

¶ 37. Pabich also learned during her interviews that Hammersley wanted to take a gun outside for target practice the day before, and that Judy had prohibited him from possessing firearms. Judy and Pabich discussed at length the firearm issue, and in her deposition Pabich recalled that Judy largely assuaged her concerns:

> I talked to her about that quite a bit. She said that that was a very common thing that they did out there, that people shot targets or whatever for recreation all the time out there, the family did that regularly, that she wasn't surprised that he asked about that, that he did not argue with her about it. She did not express much concern to me about it so much as her main emphasis when she called me, when I asked her about dangerousness, was the fact that he walked down the side of

the road. I had to persistently ask her about the guns, about the incident, to tell—you know, tell me about it.

Pabich suggested to Judy, apparently as a standard procedure, that the sheriff's department remove the guns from the home as a precaution, but Judy resisted and "did not think [the firearms were] the issue." Judy assured Pabich that the guns were secured in a locked cabinet.

¶ 38.   In light of these undisputed facts, we conclude that no reasonable fact-finder could infer a lack of good faith. This was not an instance in which Pabich merely went through the motions; she asked relevant questions, some repeatedly, and used the information given to draw a conclusion about whether Hammersley was dangerous. Pabich acknowledged that her conclusion would have been different had she known the details of Hammersley's domestic abuse arrest. However, her good faith cannot be impugned, or the adequacy of her investigation called into doubt, by the failure of others to disclose that information in response to her questioning.

¶ 39.   Because we conclude Pabich is entitled to immunity under Wis. Stat. § 51.15(11), we have no need to consider whether she is also entitled to immunity under the more general governmental immunity statute, Wis. Stat. § 893.80(4).

*By the Court.*—Judgment affirmed.