MERCYCARE INSURANCE COMPANY and
Mercycare HMO, Inc.,
Petitioners-Respondents,

v.

WISCONSIN COMMISSIONER OF INSURANCE,
Respondent-Appellant.

Supreme Court

*No. 2008AP2937. Oral argument March 2, 2010.
—Decided July 16, 2010.*

2010 WI 87

(Also reported in 786 N.W.2d 785.)

For the respondent-appellant the cause was argued by *Bruce A. Olsen,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

For the petitioners-respondents there was a brief by *Matthew J. Duchemin, William J. Toman, and Quarles & Brady LLP,* Madison, and oral argument by *Matthew J. Duchemin.*

An amicus curiae brief was filed by *Andrew C. Cook and the Wisconsin Civil Justice Council, Inc.,* Madison, and *James A. Friedman and Godfrey & Kahn, S.C.,* Madison, on behalf of the Wisconsin Civil Justice Council, Inc.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification from the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61.[1] The certification states: "We certify this appeal to the Wisconsin Supreme Court to determine whether Wis. Stat. § 632.895(7) permits an insurer to exclude maternity coverage for an insured acting as a surrogate mother. The answer to this question is determined, in part, by what level of deference, if any, should be accorded the Commissioner's decision."

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

116

¶ 2. The Commissioner concluded that Wis. Stat. § 632.895(7) does not permit an insurer to exclude generally covered maternity services for surrogate mothers. Thus, the Commissioner determined that MercyCare's 2002 Contract was ambiguous, and MercyCare's attempt to exclude generally covered maternity services for surrogate mothers under its 2002 Contract contravened the requirements of Wis. Stat. § 632.895(7). For the same reason, he determined that the 2005 Contract contravened Wis. Stat. § 632.895(7). Finally, the Commissioner also disapproved the 2005 Contract under Wis. Stat. § 631.20(2)(a)1., determining that it is misleading because the benefits are too restricted to serve the purposes for which the policy is sold. On review, the circuit court accorded no deference to the Commissioner's interpretation of Wis. Stat. § 632.895(7) and reversed the Commissioner's legal conclusions.[2]

¶ 3. Applying due weight deference, we conclude that an insurer may not make routine maternity services that are generally covered under the policy unavailable to a specific subgroup of insureds, surrogate mothers, based solely on the insured's reasons for becoming pregnant or the method used to achieve pregnancy. Accordingly, we determine that MercyCare's application of the 2002 Contract to exclude from coverage all maternity services for surrogate mothers contravenes Wis. Stat. § 632.895(7).

¶ 4. We also conclude that the Commissioner appropriately disapproved the surrogacy provision in MercyCare's 2005 Contract because it is contrary to Wis. Stat. § 632.895(7). In addition, the definition of

---

[2] Judgment of the circuit court for Rock County, James E. Welker, Judge.

"surrogate mother" set forth in the 2005 Contract is misleading because the benefits are too restricted to serve the purposes for which the policy is sold. Accordingly, we reverse the decision of the circuit court.

I

¶ 5.　MercyCare Insurance Company and Mercy-Care HMO, Inc. (collectively "MercyCare") are insurance companies authorized to do business in Wisconsin and subject to the jurisdiction and control of the Wisconsin Commissioner of Insurance. In 2002, MercyCare offered a group disability insurance policy that provided maternity coverage for eligible persons covered under the policies.

¶ 6.　J.M. and C.S. were eligible persons insured by MercyCare under MercyCare's 2002 Certificate of Coverage ("the 2002 Contract").[3] C.S. was insured as a dependent, and J.M. was insured as an employee.

¶ 7.　While insured under the 2002 Contract, J.M. and C.S. each agreed to act as a gestational carrier by carrying a child for other parents. The children carried by J.M. and C.S. are not genetically related to J.M. or C.S. respectively.

¶ 8.　Both women received health care services in connection with their pregnancies. J.M. received medical care including laboratory tests, ultrasounds, maternity care, physician visits, inpatient hospital care, anesthesia and delivery. The total costs incurred amounted to $16,774.63. C.S. received comparable pre- and post-partum medical services, with costs totaling $18,510.84.

¶ 9.　During the course of their pregnancies, MercyCare denied coverage for the maternity services re-

---

[3] Form MCHMOAUG2002

ceived by both J.M. and C.S. It notified J.M. that benefits for lab work were being denied because the contract did not cover "surrogate mother services."[4] Subsequently, MercyCare informed J.M. by letter:

> MercyCare is unable to authorize coverage for all services related to this pregnancy. Services provided from 5–10–04 through 1–7–05 are not eligible for reproductive services benefits or pregnancy benefits. Any benefits paid for the services will be recouped.

C.S. was similarly denied coverage based on the 2002 Contract's identification of "surrogate mother services" as a "non-covered service" under the Contract's "Pregnancy Benefits coverage."[5]

¶ 10. The 2002 Contract provides that "surrogate mother services" are a "non-covered service" in two separate places—under the section titled "Pregnancy Benefits" and under the section titled "Reproductive Services." However, the term "surrogate mother services" is not defined anywhere within the 2002 Contract.[6]

---

[4] The letter stated in part: "MercyCare Insurance Company has received a request for you to receive coverage for the following service: obstetrical testing at Meriter Perinatal Clinic for twin pregnancy from surrogate mother services. It has been determined that this service is not a covered benefit. Your denial was based on your Certificate of Coverage: under RE-PRODUCTIVE SERVICES; NON-COVERED SERVICES: Surrogate mother services. Therefore, MercyCare Insurance Company is unable to authorize coverage for services related to surrogate mother services."

[5] MercyCare informed C.S.: "Your denial was based on: Your HMO Certificate of Coverage under Pregnancy Benefits, non covered services: surrogate mother services are not covered."

[6] The Certificate of Coverage for the 2002 Contract had been approved by the Office of the Commissioner of Insurance (OCI) prior to its use. During the proceedings before the Commissioner, an OCI insurance examiner explained that when

¶ 11. The "Pregnancy Benefits" section provides as follows:

Covered Services:

Treatment of pregnancy is covered for an employee, an employee's covered dependent spouse, or an employee's covered dependent child.

Pregnancy benefits include coverage for inpatient hospital care and pre- and post-natal care received from a participating provider.

. . . .

Non-Covered Services:

- Surrogate mother services.

- Elective abortions.

- Maternity services received out of the service area in the last 30 days of pregnancy without prior authorization from the Plan except in an emergency. Prior authorization is based on medical necessity.

- Amniocentesis or chorionic villi sampling (CVS) solely for sex determination.

In addition, the "Reproductive Services" section of the 2002 Contract lists various covered services and provides that "surrogate mother services" are a "non-covered service."[7]

---

she approved the 2002 Contract, she believed the provision excluding "surrogate mother services" was intended to exclude the expenses incurred by an insured to pay for a third person to act as a surrogate or gestational carrier and carry a child on behalf of that insured.

[7] The following "reproductive services" are non-covered services under the 2002 Contract:

¶ 12. After denying coverage for J.M. and C.S.'s pregnancies, MercyCare sought to recoup the money it had already paid for claims related to the pregnancies. Ultimately, the services provided to both women were paid in full by third parties.

¶ 13. C.S. filed a complaint with the Office of the Commissioner of Insurance. Her complaint triggered the agency's review of MercyCare's denial of coverage to the two women. During this review, MercyCare filed its newest group disability policy insurance form ("the 2005 Contract")[8] with OCI for approval.[9]

¶ 14. In many respects, the 2005 Contract is identical to the 2002 Contract. However, the 2005 Contract revises the language of the surrogate mother services exclusion and provides a definition for the term "surrogate mother."

- Any other artificial means to achieve pregnancy, consultations for, or any procedures in connection with, but not limited to in vitro fertilization, gamete intra fallopian transfer (GIFT), embryo transplant, or any other assistive reproductive technique.

- Reversal of voluntarily induced sterilization procedures.

- Donor sperm.

- Charges for donor, laboratory or biological fees directly related to the insemination procedure.

- Revision of scarring caused by implantable birth control devices.

- Surrogate mother services.

- Elective abortions.

[8] Form no. MCPlusRCPPOAug2005.

[9] Wis. Stat. § 631.20 states that with certain exceptions, "No form [] may be used unless it has been filed with and approved by the commissioner and unless the insurer certifies that the form complies with chs. 600 to 655 and rules promulgated under chs. 600 to 655. . . ."

¶ 15. Rather than simply excluding "surrogate mother services," the 2005 Contract provides that the following is a "Non-Covered Service": "Treatment, services or supplies for a surrogate mother or any pregnancy resulting from *your* service as a surrogate mother." Additionally, the 2005 Contract provides the following definition of the term "surrogate mother":

> Surrogate mother means a woman who, through in vitro fertilization or any other means of fertilization, gives birth to a child which she may or may not have a genetic relationship to, or an individual who provides a uterus for the gestation of a fertilized ovum obtained from a donor when the child will be parented by someone other than the woman who gives birth.

¶ 16. OCI disapproved the 2005 Contract by letter dated January 11, 2006. The letter explained that the exclusion for "[t]reatment, services or supplies for a surrogate mother or any pregnancy resulting from your service as a surrogate mother," must be deleted because "[a] policy that provides maternity coverage may not limit the coverage based on method of conception, as such a limitation is unfairly restrictive and discriminatory."[10] MercyCare requested a hearing.

¶ 17. On February 15, 2006, OCI issued a Notice of Hearing alleging that MercyCare violated Wis. Stat. § 632.895(7) when it denied coverage for J.M. and C.S.'s pregnancies under the 2002 Contract. The notice fur-

---

[10] Under Wis. Stat. § 631.20(2)(a), the commissioner may disapprove a form upon a finding that "it is inequitable, unfairly discriminatory, misleading, deceptive, obscure or encourages misrepresentation," including cases where the form "[i]s misleading because its benefits are too restricted to achieve the purposes for which the policy is sold" and cases where the form "violates a statute or rule promulgated by the commissioner, or is otherwise contrary to law."

ther alleged that the disapproval of the 2005 Contract was appropriate because the policy exclusions violated the mandated maternity benefits of Wis. Stat. § 632.895(7) and were misleading under Wis. Stat. § 631.20. The case ultimately went before the Commissioner of Insurance. The parties agreed to submit the case on the basis of briefs, a stipulation of facts, and other stipulated documentation.

¶ 18. The Commissioner issued a final decision on December 8, 2006. It concluded that: (1) under the mandate of Wis. Stat. § 632.895(7),[11] MercyCare may not exclude maternity coverage of otherwise covered persons based on their status as surrogate mothers; (2) even if the surrogacy services could be properly excluded, the language of the 2002 Contract is ambiguous; (3) OCI appropriately disapproved MercyCare's 2005 Contract because the surrogate mother exclusion is contrary to Wis. Stat. § 632.895(7) and the 2005 Contract is misleading because its benefits are too restricted to achieve the purposes for which the policy is sold.

¶ 19. The decision first addressed whether MercyCare was permitted under Wis. Stat. § 632.895(7) to exclude maternity coverage on the basis that the insured was acting as a surrogate mother. The Commissioner explained that the issue required the application of "exclusions or limitations" to a set of facts unanticipated by the legislature at the time the statute was passed. According to the Commissioner's interpreta-

---

[11] Wis. Stat. § 632.895(7) provides as follows:

Every group disability insurance policy which provides maternity coverage shall provide maternity coverage for all persons covered under the policy. Coverage required under this subsection may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy.

tion, "the legislative history indicates that the statute's purpose is one of inclusiveness" and therefore, the statute ensures that if the policy provides maternity coverage, all covered persons must be treated equally. "[T]he answer to whether MercyCare's exclusion is permissible requires a determination of whether MercyCare is attempting to exclude the provision of a group of services or the exclusion of a group of insureds."

¶ 20. The Commissioner concluded that under the statute, an insurer may deny coverage of certain specific procedures, such as in vitro fertilization, to all people covered under the policy. However, an insurer may not deny coverage for all maternity services to some insureds covered under the policy based on their reasons for becoming pregnant. Therefore, the insurer may not deny coverage of generally covered maternity services because the insured is a surrogate mother. Additionally, the Commissioner concluded that the surrogacy exclusion in the 2002 Contract is ambiguous and that OCI's disapproval of the 2005 Contract was appropriate under Wis. Stat. § 631.20.

¶ 21. MercyCare filed a petition for judicial review in the Rock County Circuit Court. The circuit court accorded no deference to the Insurance Commissioner's legal conclusions because the Commissioner had not previously interpreted § 632.895(7) and because it determined that the Commissioner had no particular expertise that would assist it in determining the applicability of the statute. Rather, it stated that the case was one of "first impression."

¶ 22. The circuit court determined that "the Commissioner of Insurance exceeded its statutory authority in disapproving the certificate of insurance," and it ordered the Commissioner to approve the 2005 Contract. In reaching this decision, it concluded that Wis.

Stat. § 632.895(7) "clearly and unambiguously" permitted MercyCare to exclude maternity coverage for otherwise covered persons who were serving as surrogate mothers. It determined that the statute required only that "any exclusions or limitations must be applied uniformly to all covered persons," and that "the exclusion for surrogate parents is an exclusion which applies uniformly to all covered persons."[12]

¶ 23. The Commissioner appealed, and the court of appeals certified the appeal to this court. It explained that its answer to the question of the proper interpretation of the statute would be determined, in part, by the level of deference that should be accorded the Commissioner's decision. Although OCI had never before interpreted the specific statutory subsection at issue, the court implied that OCI had experience interpreting other mandatory coverage provisions. The court stated that "guidance is [] needed on this topic because it is not apparent from the case law to date what level of deference should be given to an agency's decision when the issue is particularly within the agency's area of expertise and specialized knowledge, but the agency is construing a specific statute for the first time."

¶ 24. The court of appeals commented that "[a] number of cases suggest that a question is *not* one of first impression . . . simply because an agency is addressing a new fact situation for the first time. We question whether the approach should be any different when an agency is addressing particular statutory language for the first time."

---

[12] The circuit court also stated that it was unnecessary to address the other issues raised by the parties.

## II

■
¶ 25. On appeal, we review the decision of the Commissioner of Insurance rather than the decision of the circuit court. The parties dispute, and the court of appeals was uncertain of, the applicable standard of review. We address this question first.

■■
¶ 26. We are asked to interpret Wis. Stat. § 632.895(7) and apply it to the exclusions at issue in this case. We are also asked to interpret MercyCare's 2002 and 2005 Contracts, which are policies of insurance. Interpretation and application of statutes and insurance policies are questions of law. *Volvo Trucks N. Am. v. Wausau Truck Ctr.*, 2010 WI 15, ¶ 11, 323 Wis. 2d 294, 779 N.W.2d 423; *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, ¶ 18, 311 Wis. 2d 492, 753 N.W.2d 448. This court decides questions of law independently, but benefits from the analyses rendered by the circuit court and court of appeals. *Pawlowski v. Am. Family Mut. Ins. Co.*, 2009 WI 105, ¶ 16, 322 Wis. 2d 21, 777 N.W.2d 67.

■■
¶ 27. Because statutory interpretation is a question of law, a court is never bound by an agency's interpretation of a statute. *Hutson v. State Personnel Com'n*, 2003 WI 97, ¶ 31, 263 Wis. 2d 612, 665 N.W.2d 212. Nevertheless, a court will under certain circumstances give deference to an agency's statutory interpretation. *Id.*; *Racine Harley-Davidson v. State,* 2006 WI 86, ¶ 11, 292 Wis. 2d 549, 717 N.W.2d 184.

¶ 28. In *Racine Harley-Davidson,* we clarified the three levels of deference to be accorded to an agency's interpretation of a statute: no deference, due weight

deference, and great weight deference. 292 Wis. 2d 548, ¶¶ 12–20. These three levels take into account the comparative institutional qualifications and capabilities of the court and the administrative agency. *Id.*, ¶¶ 13–14.

¶ 29. A reviewing court accords an agency's statutory interpretation no deference when the issue is one of first impression, when the agency has no experience or expertise in deciding the legal issue presented, or when the agency's position on the issue has been so inconsistent as to provide no real guidance. *Id.*, ¶ 19. When no deference to the agency decision is warranted, the court interprets the statute independently and adopts the interpretation that it deems most reasonable. *Id.*

¶ 30. A reviewing court accords due weight deference when the agency has some experience in an area but has not developed the expertise that places it in a better position than the court to make judgments regarding the interpretation of the statute. *Id.*, ¶ 18. When applying due weight deference, the court sustains an agency's interpretation if it is not contrary to the clear meaning of the statute—unless the court determines that a more reasonable interpretation exists. *Id.*

¶ 31. Finally, a reviewing court accords great weight deference when each of four requirements are met: (1) the agency is charged by the legislature with the duty of administering the statute; (2) the agency's interpretation is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's inter-

pretation will provide uniformity and consistency in the application of the statute. *Id.*, ¶ 16. When applying great weight deference, the court will sustain an agency's reasonable statutory interpretation even if the court concludes that another interpretation is equally or more reasonable. *Id.*, ¶ 17. The court will reverse the agency's interpretation if it is unreasonable—if it directly contravenes the statute or the state or federal constitutions, if it is contrary to the legislative intent, history, or purpose of the statute, or if it is without a rational basis. *Id.*

¶ 32.　Whichever level of deference is granted, the reviewing court does not abdicate its own authority and responsibility to interpret the statute. *Id.*, ¶ 14; *Hutson,* 263 Wis. 2d 612, ¶ 31. In assessing the agency's interpretation, the court must itself interpret the statute to determine whether the agency's interpretation is reasonable. *Racine Harley-Davidson,* 292 Wis. 2d 549, ¶ 15. It is only under the great weight deference standard that the agency's specialization and expertise is so extensive that the court views the agency's interpretation as the one to adopt even if it is not the most reasonable one.

¶ 33.　Here, the focus of our inquiry in determining whether there is great weight deference is whether the Commissioner's interpretation is one of "long standing." OCI has extensive experience interpreting and applying Wis. Stat. § 632.895 generally,[13] but no experience interpreting the requirements of sub. (7), the specific statutory language upon which this case turns. The court of appeals inquired about the appropriate

[13] *See, e.g., Mutual Benefit Life Ins. Co. v. Ins. Com'r,* 151 Wis. 2d 411, 413–15, 444 N.W.2d 450 (Ct. App. 1989).

level of deference when the issue is particularly within the agency's area of expertise and specialized knowledge, but the agency is construing specific statutory language for the first time.

¶ 34. Wisconsin courts have previously accorded great weight deference to an agency's application of a familiar statute to a novel set of facts. *See, e.g., Town of Russell Volunteer Fire Dep't. v. LIRC*, 223 Wis. 2d 723, 733, 589 N.W.2d 445 (Ct. App. 1998). Yet, applying statutory language to a novel set of facts is not the same as interpreting particular statutory language for the first time.

¶ 35. It cannot be said that the Commissioner's interpretation of this specific subsection is one of "long standing." In this case, the Commissioner, like this court, is interpreting the requirements of sub. (7) for the first time. Under these circumstances, it would make little sense to defer to the Commissioner's statutory interpretation even if the court concludes that an equally reasonable or a more reasonable interpretation exists. We conclude that a reviewing court should not give great weight deference to an agency's interpretation of a statute when the agency is interpreting particular statutory language for the first time.[14]

---

[14] MercyCare brings to our attention several decisions of the court of appeals which could be read to state that an agency's experience in administering a "particular statutory scheme" is sufficient for affording the agency great weight deference. *See, e.g., Barron Elec. Co-op v. Pub. Serv. Com'm Wis.*, 212 Wis. 2d 752, 764, 569 N.W.2d 726 (Ct. App. 1997); *Town of Russell Volunteer Fire Dep't. v. LIRC*, 223 Wis. 2d 723, 733, 589 N.W.2d 445 (Ct. App. 1998). Our conclusion clarifies that great weight deference is not warranted merely because an

¶ 36. Nevertheless, it is important to recognize that the Commissioner has been charged by the legislature with the administration of the mandatory coverage statutes and has the responsibility of ensuring that the insurance policies issued in Wisconsin comply with statutory regulations. Due to this legislative mandate, OCI addresses an untold number of insurance policies each year. As a result, OCI has developed experience, institutional qualifications, and specialized knowledge in the area of mandatory coverage, generally. Thus, it also makes little sense to accord no deference at all to the Commissioner's interpretation of the statutory language at issue here.

¶ 37. We conclude that due weight deference may be warranted when an agency has specialized experience with the issues regulated by the statute, but has not yet interpreted the specific statutory language at issue. *See, e.g., Wis. Dep't Revenue v. Menasha Corp.,* 2008 WI 88, ¶ 51, 311 Wis. 2d 579, 754 N.W.2d 95. We acknowledge that in most situations, applying due weight deference will lead to the same result as would

agency has been charged with administering a particular statutory scheme when the agency has not interpreted the specific statutory language at issue.

We are not persuaded that our conclusion is inconsistent with the court of appeals' decisions cited by MercyCare. In *Barron,* for instance, the commission had interpreted and applied the provisions of the statute to similar disputes, and on at least one occasion, the commission had interpreted the exact statutory language that was at issue in the case. 212 Wis. 2d at 766. Further, in *Town of Russell,* the Labor and Industry Review Commission had vast experience determining whether an employee was acting within the scope of employment at the time of an accident and was therefore entitled to worker's compensation benefits.

applying no deference at all. "Under both due weight deference and no deference, the reviewing court may adopt, without regard for the agency's interpretation, what it views as the most reasonable interpretation of the statute." *Racine Harley-Davidson,* 292 Wis. 2d 549, ¶ 20.

¶ 38. Applying the above principles here, we observe that the Commissioner has been charged by the legislature with approving group disability insurance forms, and the Commissioner may disapprove a form upon concluding that it violates a statute or is otherwise contrary to law. Wis. Stat. §§ 631.20(1); 631.20(2). The Commissioner has substantial experience interpreting mandatory coverage provisions. Nevertheless, the Office of the Commissioner of Insurance has never specifically interpreted the language of sub. (7), which addresses maternity coverage, and it therefore has not developed the expertise that places it in a better position than the court to make judgments regarding the interpretation of this statute. We conclude that due weight deference is warranted,[15] and we will sustain

---

[15] The concurrence's determination about deference misses the mark. It confuses an inconsistency in the interpretation of ambiguous policy language with an inconsistency in the interpretation of the statute. *See* concurrence, ¶¶ 86, 94–95.

The OCI insurance examiner who approved the 2002 Contract testified about her reasons for approving the exclusion for "surrogate mother services." She interpreted the exclusion as addressing the expenses incurred by an insured to pay for an uninsured third party to carry a child on that insured's behalf. *See supra,* ¶ 10, n.6.

When the Commissioner reviewed the 2005 contract as a part of this litigation, he did not conclude, as the concurrence contends, "that the 2002 contract violated § 632.895(7)." Con-

131

■■■■■■■■■■■■■■■■■

the Commissioner's statutory interpretation if it is not contrary to the clear meaning of the statute and no more reasonable interpretation exists. We turn now to the statute.

## III

¶ 39. Wisconsin Stat. §§ 632.71–632.899 regulate group disability insurance contracts. Section 632.895(7) sets forth specific requirements for maternity coverage. We are asked to determine whether MercyCare's 2002 Contract, which excludes "surrogate mother services," contravenes the requirements of Wis. Stat. § 632.895(7).

¶ 40. We begin our examination of the statute by setting forth the relevant statutory and legislative history. Next, we turn to the Commissioner's interpretation of the statute to determine whether it is reasonable. Finally, we examine other interpretations to determine whether they are more reasonable than the interpretation advanced by the Commissioner.

¶ 41. Wisconsin Stat. Ch. 632 contains provisions applying to specific types of insurance contracts. Wisconsin Stat. § 632.895 sets forth various mandatory coverages in group disability insurance policies. Wisconsin Stat. § 632.895(7), which regulates maternity coverage, provides as follows:

---

currence, ¶ 94. Rather, he determined that the undefined term "surrogate mother services" in that contract was ambiguous and that it was MercyCare's application of the ambiguous term that violated the statute.

Although the record demonstrates that OCI has not consistently interpreted the language of MercyCare's 2002 contract, there is no evidence of inconsistency in OCI's interpretation of the statute. Thus, there is no basis for the de novo review undertaken by the concurrence.

132

Every group disability insurance policy which provides maternity coverage shall provide maternity coverage for all persons covered under the policy. Coverage required under this subsection may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy.[16]

¶ 42. The parties and the Commissioner agree that the first sentence of the statute prohibits an insurer from selectively offering maternity coverage to some insureds but not to others. Rather, the first sentence requires an insurer that decides to offer maternity coverage to anyone under the policy to offer that coverage to all persons under the policy. The parties agree that the mandate of the first sentence is very broad.

¶ 43. The parties' dispute centers around the meaning of the second sentence: "Coverage required under this subsection may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy." From that sentence, it is clear that an insurer may exclude or limit some aspects of maternity coverage. However, no maternity coverage may "be subject to exclusions or limitations which are not applied to other maternity coverage under the policy."

¶ 44. Whether this sentence permits the exclusion of all maternity services to a subgroup of insureds based on the fact that the insured is serving as a surrogate

---

[16] The surrounding subsections regulate other aspects of group disability insurance coverage including home care, skilled nursing care, kidney disease treatment, coverage of newborn infants, coverage of grandchildren, equipment and supplies for treatment of diabetes, coverage for mammograms, drugs for treatment of HIV infection, and lead poisoning screening.

mother is not readily apparent from the text. As the Commissioner opined, it is likely that the current understanding of surrogacy was not a factual situation contemplated by the legislature when it passed the relevant statutory language in 1981 and 1985.[17] Indeed,

---

[17] The gravamen of the concurrence's statutory interpretation is illusory. It relies on a void in the legislative debate. The concurrence asserts that the legislature's failure to discuss the "complicated social question" of surrogacy when enacting Wis. Stat. § 632.895(7) is an indication that the legislature did not intend the statute to be applied to women acting as gestational carriers. Concurrence, ¶ 102.

Failure to discuss an issue cannot be regarded as a positive indication of what the legislature intended. It is far more likely that the legislature did not discuss surrogacy and gestational carriers because those issues were not contemplated by the legislature when the statute was enacted in 1981 and amended in 1985.

It was not until the 1988 case, *In re Baby M,* 537 A.2d 1227 (N.J. 1988), that the political tale of surrogacy attracted media attention and "left its mark on American law." Elizabeth S. Scott, *Surrogacy and the Politics of Commodification,* 72 Law & Contemp. Probs. 109, 109 (Summer 2009). In *Baby M,* the birth mother entered into a contract to conceive and bear a child that would be raised by another couple. The child was conceived through artificial insemination using the birth mother's ovum and the intended father's sperm. "It was through the lens of *Baby M* that this innovative use of reproductive technology was first scrutinized as an issue of social, political, and legal interest." *Id.*

Courts are routinely required to interpret the meaning of statutory language and apply it to "complicated social questions" involving technology that was not contemplated when a statute was enacted. *See, e.g., Schill v. Wis. Rapids Sch. Dist.,* 2010 WI 86, ¶ 4, 327 Wis. 2d 572, 786 N.W.2d 177 (discussing how the public records law should be applied to email, a technology not contemplated when the legislature enacted the law). The question is, and should be, how the words of a statute

cases from the early 1980s demonstrate that the term "surrogate mother" was used at that time to refer to a woman who was a caregiver for another woman's child.[18]

¶ 45. Subsection (7) was originally added to the mandatory coverage statute in 1981. It extended maternity coverage to dependent children only:

> Every group disability policy which provides coverage of dependent children and maternity coverage for any individual shall provide maternity coverage for dependent children. Coverage required under this subsection may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy.

The Legislative Reference Bureau explained that "[m]aternity coverage for dependent children may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy."

¶ 46. The scope of sub. (7) was broadened by 1985 Wisconsin Act 56, the Abortion Prevention and Family Responsibility Act of 1985. This act was drafted by the Legislative Council Special Committee on Pregnancy

---

apply to a new factual situation. If the legislature disagrees with our interpretation, it is free to debate the issue and pass legislation amending the statute.

[18] *See Estate of Hoier v. Knapp,* No. 81–1341, slip op. at 2 (Wis. Ct. App., Apr. 27, 1982) ("[T]he decedent was and would have continued to be a surrogate mother to her minor brothers and sister because of the mother's illness and subsequent death"); *K.S.R. v. A.L.R.,* No. 81–1292, slip op. (Wis. Ct. App., June 18, 1982). Portions of the Wisconsin statutes also reflect this understanding of the term "surrogate." *See, e.g.,* Wis. Stat. § 115.792(1)(a)2 ("For a child who is a ward of the state, a judge overseeing the child's care may appoint a surrogate for the child's parents . . . .").

Options. Among other instructions, the committee had been specifically directed to "make available health insurance coverage for childbirth in all instances." Wisconsin Legislative Council Report No. 16 to the 1985 Legislature, Legislation on Pregnancy Options, Oct. 7, 1985, at 5.

¶ 47. 1985 Wisconsin Act 56 amended the first sentence to read: "Every group disability insurance policy which provides maternity coverage shall provide maternity coverage for all persons covered under the policy." Thus, the act expanded the reach of sub. (7) from dependent children to "all persons covered under the policy." The act did not amend the second sentence of sub. (7). Thus, maternity coverage for "all persons covered under the policy" could not "be subject to exclusions or limitations which are not applied to other maternity coverage under the policy."

¶ 48. In a memo to the Joint Committee on Finance, the Director of the Legislative Fiscal Bureau explained that under the previous enactment, "[m]aternity coverage [was] not specifically required for persons other than dependent children." However, the 1985 changes "would require that, if maternity coverage is provided under the policy, all persons who are generally covered under the policy must receive maternity coverage." The fiscal note accompanying the act explained that the amendments required "every group disability insurance policy which provides maternity coverage to any individual to provide the same level to all persons covered under the policy."

¶ 49. In interpreting the statute, the Commissioner recognized that the second sentence of sub. (7) permits some exclusions and limitations. However, he also recognized that the exclusion written by Mercy-Care attempts to exclude coverage of generally covered

maternity services available to other insureds on the sole basis that an insured is a surrogate mother. The question was whether an exclusion of generally covered maternity services to those insureds acting as surrogate mothers contravenes the statute.

¶ 50. The Commissioner quoted the definition of "exclusion" from a Wisconsin case that was contemporary to the drafting of the statute: "An exclusion, in insurance parlance, serves the purpose of taking out persons or events otherwise included within the defined scope of coverage." *Bortz v. Merrimac Mut. Ins. Co.,* 92 Wis. 2d 865, 871, 286 N.W.2d 16 (Ct. App. 1979). Although an exclusion typically takes out "persons or events," the Commissioner determined that the first sentence of sub. (7) prohibits the "taking out of *persons* who receive maternity coverage." (Emphasis added.)

¶ 51. Thus, the Commissioner concluded that although an insurer may exclude or limit "certain services" as long as it does so uniformly, the insurer "may not discriminate against a subgroup of insureds." Accordingly, an insurer may make specific procedures—such as in vitro fertilization, elective abortion, and amniocentesis or chorionic villi sampling solely for sex determination—non-covered benefits under the policy. The insurer may exclude these procedures for all insureds. However, the Commissioner concluded that it could not exclude services that are generally covered under the policy—such as inpatient hospital care and pre- and post-natal care—for a specific subgroup of insureds, surrogate mothers, based solely on the insured's reasons for becoming pregnant or the method used to achieve pregnancy.

¶ 52. MercyCare asserts that the Commissioner's interpretation of the statute is unreasonable because it conflicts with the language of sub. (7), which permits

some exclusions. Therefore, MercyCare contends that the unambiguous statutory language permits it to exclude not only specific services, but specific subgroups of insureds as well.

¶ 53. The meaning of the statute and its application to the type of exclusion presented here are not readily apparent from the statutory text. Therefore, applying the standard for due weight deference, we cannot conclude that the Commissioner's interpretation is contrary to the clear meaning of the statute. *See, supra,* ¶ 38.

¶ 54. Further, the Commissioner's interpretation is reasonable because it reconciles the broad mandate of the first sentence, which requires that coverage be granted to all members of a group, and the second sentence, which allows exclusions under certain circumstances. The Commissioner's interpretation is also consistent with the legislative history, which explains that "every group disability insurance policy" must "provide the same level to all persons covered under the policy."

¶ 55. Giving due weight deference to the Commissioner's interpretation, we will nevertheless decline to adopt the Commissioner's interpretation if there is another, more reasonable interpretation of the statute. MercyCare asserts that "the statute was enacted to end discrimination based on the insured's status as a member, spouse or child, not to end all discrimination." It advances that the second sentence requires only that any exclusion in its policy be applied uniformly. MercyCare contends that this interpretation of the statute is more reasonable.

¶ 56. The crux of MercyCare's argument is that "the statute allows an exclusion to take out a person otherwise included, as long as under the same circum-

stances all persons otherwise included would also be taken out." Thus, it asserts, the statute "allows coverage to be excluded for an insured who chooses to become a surrogate mother as long as the exclusion applies equally and uniformly to all insureds who chose to become surrogate mothers, i.e. a group member, a group member's spouse, or a group member's dependent child."

¶ 57. MercyCare's interpretation suffers from some infirmities. Initially, we observe that it does not find direct support in the text of the statute. The statute does not state that it permits an exclusion that discriminates among subgroups as long as it applies uniformly to group members, spouses, and dependent children. Rather, it states that the coverage for "all persons covered under the policy . . . may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy."

¶ 58. A second problem with MercyCare's interpretation is that it would produce unreasonable results. Taken to its logical conclusion, MercyCare's interpretation would permit an insurer to discriminate against any number of subgroups of insureds, as long as the discrimination was "uniform." For example, at oral argument, MercyCare suggested that it would be permitted to exclude an insured's fourth pregnancy—or even a second pregnancy—as long as that exclusion was applied to all policies uniformly.[19] Such a result would undercut the broad mandate of the first sentence and is not reasonable.

---

[19] At oral argument, the following exchange occurred between the court and counsel for MercyCare:

> Q: Under that second sentence, could MercyCare say we are providing coverage for pregnancies one through three, but any of you women who get pregnant with number four, you're on your own? . . .

¶ 59. The concurrence also offers an interpretation of the statute. It concludes that Wis. Stat. § 632.895(7) permits an insurer to exclude maternity coverage for "gestational carrier services." Concurrence, ¶ 83. It explains that it reaches this conclusion because maternity care for a gestational carrier is a "contract expense" that inures to the benefit of a third party. *Id.*, ¶ 100.

¶ 60. There are three problems with the concurrence's interpretation. First, the concepts of gestational carriers and contract expenses are not found in the language of the statute. The concurrence carves out an exception that is not supported by the statute's text.

¶ 61. Second, although the concurrence's analysis is based on the existence of a contract, it relies on a definition of "gestational carrier" that makes no reference to the existence of a contract. The concurrence explains that a gestational carrier is a woman who "receives a transfer of an embryo created by ovum and sperm" and who has no genetic relationship with the baby she carries. *Id.*, ¶ 83 n.2. Nothing in the definition of "gestational carriers" restricts the term's use to a

A: Yes, I think they could.

Q: Why?

A: Because that exclusion would apply uniformly to every single person under the policy. Any dependent, any spouse, or any covered employee would know going in that if they got pregnant a fourth time, that coverage would be excluded.

Later, counsel was asked to clarify MercyCare's position on uniformity:

Q: If you say that the second sentence authorizes exclusions and the test is uniformity, it could really be the second child. . . . Could it say to unmarried mothers?

A: I don't think it could say for unmarried mothers, well, I don't think there's anything necessarily in the language of this statute that provides it but I do believe it would run afoul of [other discrimination laws].

contract situation where the gestational carrier intends that the baby will be raised by other parents. *See Id.*

¶ 62. Third, the concurrence's interpretation, based on a contract analysis, raises more questions than it answers. It is not entirely clear how its interpretation of the statute would be applied. What is clear, however, is that the existence of contract expenses—the rationale adopted by the concurrence—does not appear to yield a predictable result.

¶ 63. Imagine, for instance, a situation where an insured is impregnated via embryo transfer and shares no genetic material with the child she carries. Could the insurer exclude maternity coverage for that insured, even if there was no contract and the insured became pregnant with the express purpose of parenting the child? Under the concurrence's interpretation, the answer would appear to be yes—the insured is a gestational carrier and can be excluded.

¶ 64. Alternatively, imagine the fact situation in *In re Baby M,* 537 A.2d 1227 (N.J. 1988), the case that raised national awareness of the social and legal issues involved with surrogacy. *See supra,* ¶ 44 n.17. There, the birth mother supplied the ovum and carried the baby to term, but her purpose in becoming pregnant was to fulfill a contract with third parties who intended to raise the baby. Could an insurer have excluded coverage for the delivery of Baby M? Under the concurrence's interpretation, the answer appears to be no. Despite the existence of a contract, Baby M's birth mother was not a gestational carrier because she was genetically related to the child she carried.

¶ 65. The questions raised by the concurrence's interpretation are endless. Is the basis of the concurrence's rationale really the existence of a contract, or is it status as a gestational carrier, intent to

141

parent, or all three? How would the concurrence's interpretation affect independent adoptions, where there is often a contract providing that the adoptive parents will pay for the birth mother's maternity expenses? *See* Audra Behne, *Balancing the Adoption Triangle,* 15 In Pub. Interest 49, 79 (1996–1997) ("[U]sually the adoptive parents pay the birth mother's maternity expenses and legal fees."). Who would pay for the maternity coverage if the parties contested the rights and obligations of parentage after the child was born? What would happen if a gestational surrogate decided mid-pregnancy to parent the child, or if the intended parents decided to divorce and refused to accept the child? What would happen if a court concluded that the surrogacy contract was unenforceable?[20]

¶ 66. The concurrence's interpretation writes language into the statute, relies on a definition of gestational carrier that is not consistent with the contract-based rationale it advances, and would lead to unpredictable results. Therefore, it is not a reasonable interpretation of the statute.

¶ 67. Having concluded that the Commissioner's interpretation is reasonable and is not contrary to the clear meaning of the statute, we determine that the

---

[20] Wisconsin Stat. § 69.14(1)(h) provides that when a child is born to a surrogate mother, the child's birth certificate shall list information about the surrogate mother, and information about the father shall be omitted. If a court determines parental rights, a new birth certificate will be issued. The statutes do not distinguish between traditional surrogacy arrangements and gestational surrogacy arrangements. Neither the statutes nor our case law provides specific guidance about how a determination of parental rights would be made under these circumstances.

interpretations advanced by MercyCare and the concurrence are not more reasonable than the interpretation advanced by the Commissioner. Further, no more reasonable interpretation exists. Thus, we affirm the Commissioner's interpretation of Wis. Stat. § 632.895(7).

¶ 68. We conclude that the statute permits an insurer to exclude or limit certain services and procedures, as long as the exclusion or limitation applies to all policies. However, an insurer may not make routine maternity services that are generally covered under the policy unavailable to a specific subgroup of insureds, surrogate mothers, based solely on the insured's reasons for becoming pregnant or the method used to achieve pregnancy. Accordingly, MercyCare's attempt to exclude surrogate mothers from coverage under its 2002 Contract contravenes Wis. Stat. § 632.895(7), and MercyCare wrongfully denied maternity coverage to J.M. and C.S.

IV

¶ 69. Having determined that the statute does not permit MercyCare to exclude maternity services on the basis of an insured's role as a surrogate mother, it follows that the Commissioner appropriately disapproved the surrogacy provision in the 2005 Contract as contrary to § 632.895(7). The Commissioner also offered an additional reason for disapproving the provision—that it is misleading because it is too restricted to achieve the purposes for which the policy is sold. This reason also supports our conclusion that the Commissioner appropriately disapproved the surrogacy provision in the 2005 Contract.

143

¶ 70. Under Wis. Stat. § 631.20(1), MercyCare was required to file its 2005 Contract with the Commissioner for approval. Section 631.20(2) provides that the Commissioner may disapprove a form if it makes one of several findings. Disapproval is authorized if the Commissioner finds that the form "violates a statute or a rule promulgated by the commissioner, or is otherwise contrary to law." Wis. Stat. § 631.20(2)(d). Disapproval is also authorized if the Commissioner finds:

> That it is inequitable, unfairly discriminatory, misleading, deceptive, obscure or encourages misrepresentation, including cases where the form:
>
> 1. Is misleading because its benefits are too restricted to serve the purposes for which the policy is sold.

Wis. Stat. § 631.20(2)(a).

¶ 71. The 2005 Contract excludes "[t]reatment, services, or supplies for a surrogate mother or any pregnancy resulting from *your* service as a surrogate mother." Unlike the 2002 Contract, it defines the term "surrogate mother" as follows:

> Surrogate mother means a woman who, through in vitro fertilization or any other means of fertilization, gives birth to a child which she may or may not have a genetic relationship to, or an individual who provides a uterus for the gestation of a fertilized ovum obtained from a donor when the child will be parented by someone other than the woman who gives birth.

¶ 72. The Commissioner concluded that this definition was misleading because its benefits are too restricted to achieve the purposes for which the policy was sold. Although MercyCare asserted the definition was meant to encompass expenses incurred by women who profited by carrying a child for another parent to

144

raise, the Commissioner concluded that there is nothing in the 2005 definition of surrogate mother that limits the exclusion to those situations. Rather, aside from being contrary to the statutory mandate, MercyCare's definition was overly broad and would have the unintended effect of excluding coverage for some insureds that MercyCare may not have intended to exclude. As a result, MercyCare would have "broad discretion in applying its exclusion to any number of women based solely on how or why they are pregnant."

¶ 73. MercyCare now asserts that the Commissioner erred in disapproving the 2005 Contract because an OCI insurance examiner testified at deposition that if the exclusion did not contravene the statute, she otherwise did not have "any objection to the definition of surrogate mother in the 2005 certificate." MercyCare explains that the Commissioner ignored this testimony, and his decision is therefore not supported by substantial evidence in the record. However, the interpretation of a definition in an insurance policy is a question of law. Thus, neither the Commissioner nor this court is bound by the legal conclusion of any witness.

¶ 74. MercyCare's definition of "surrogate mother" appears to encompass two different types of insureds: (1) an insured who through in vitro or any other means of fertilization gives birth to a child, regardless of whether she has a genetic relationship with that child; and (2) an insured who provides a uterus for the gestation of a fertilized ovum obtained from a donor when the child will be parented by someone other than the insured.

¶ 75. The first category appears to exclude all pregnancies. It would exclude insureds who do or do not have a genetic relationship to the children they give birth to when fertilization occurs "by any means." The

145

Commissioner is correct that even if an exclusion for surrogacy were permissible, the definition of "surrogate mother" is misleading under Wis. Stat. § 631.20(2)(a). With such a broad exclusion, the policy's benefits are too restricted to achieve the purposes for which the policy is sold.

¶ 76. MercyCare acknowledges that the definition suffers from a drafting error, and it asserts that a comma should be inserted between "donor" and "when the child will be parented by someone other than the woman who gives birth."[21] Thus, MercyCare contends, the phrase "when the child will be parented by someone other than the woman who gives birth" would modify both categories of insureds.

¶ 77. At oral argument, counsel for MercyCare explained that if a comma is added to the definition, "[t]he person who would be excluded would be the insured employee, spouse, or dependent who actually becomes pregnant, regardless of how that person became pregnant, [] if the pregnancy was for the purpose of giving that child to some other non-covered [parent]." Counsel further explained that its definition rested upon the intention of the insured at the moment the insured became pregnant:

Q: [W]hat does the phrase "any other means of fertilization" mean?

A: I don't know.

---

[21] Once edited, the definition would read: "Surrogate mother means a woman who, through in vitro fertilization or any other means of fertilization, gives birth to a child which she may or may not have a genetic relationship to, or an individual who provides a uterus for the gestation of a fertilized ovum obtained from a donor, when the child will be parented by someone other than the woman who gives birth." (Emphasis added.)

Q: Seems fairly broad, doesn't it?

A: Yes, it is broad.

Q: So, if you become pregnant, isn't that what it says, regardless of how—

A: It does.

Q: —and whether it is genetic or not?

A: Right. And that covers traditional surrogacy versus gestational surrogacy, basically bringing us back to the point, which is whether the person is intending to be the parent, or providing the child to the intended parent.

Q: And it has to be at the time of the fertilization?

A: The time of the pregnancy, which I would interpret as the time of the fertilization.

Q: So, if I at the moment I become pregnant, plan on keeping the baby, but at some time during the pregnancy, decide to give it up for adoption or otherwise, I would be covered.

A: I believe you would.

¶ 78. Even with the addition of a comma to correct the error in draftsmanship, we conclude that MercyCare's definition of "surrogate mother" is overly broad. Nothing in the text of the definition limits the exclusion to situations where the insured knows "at the moment of fertilization" that the child will be parented by someone else. Rather, it appears that MercyCare could invoke the exclusion and deny coverage in any situation "when the child will be parented by someone other than the woman who gives birth"—regardless of when that decision was made.

147

¶ 79. Further, even if the definition did turn on an insured's intention at "the moment of fertilization," the exclusion could be applied to an insured who knows that in the event of an unplanned pregnancy, she would carry the child to term and then put the child up for adoption. Nothing in the definition of "surrogate mother" limits the exclusion to a commercial relationship where an insured agrees to carry a child for a third party, expecting to be compensated for that service.

¶ 80. We conclude that the Commissioner appropriately disapproved the surrogacy provision in the 2005 Contract under Wis. Stat. § 631.20(2)(a)1. In addition to contravening Wis. Stat. § 632.895(7), MercyCare's definition of "surrogate mother" is misleading because it is too restricted to serve the purposes for which the policy is sold.

V

¶ 81. In sum, applying due weight deference, we conclude that an insurer may not make routine maternity services that are generally covered under the policy unavailable to a specific subgroup of insureds, surrogate mothers, based solely on the insured's reasons for becoming pregnant or the method used to achieve pregnancy. Accordingly, we determine that MercyCare's application of the 2002 Contract to exclude from coverage all maternity services for surrogate mothers contravenes Wis. Stat. § 632.895(7).

¶ 82. We also conclude that the Commissioner appropriately disapproved the surrogacy provision in MercyCare's 2005 Contract because it is contrary to Wis. Stat. § 632.895(7). In addition, the definition of "surrogate mother" set forth in the 2005 Contract is misleading because the benefits are too restricted to serve the purposes for which the policy is sold. Accordingly, we reverse the judgment of the circuit court.

*By the Court.*—The judgment of the circuit court is reversed.

¶ 83. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). I agree with the majority opinion's conclusion that the 2002 MercyCare[1] policy did not exclude healthcare services for the pregnancies and deliveries of the gestational carriers, J.M. and C.S.[2] I also agree that the 2005 MercyCare policy was properly disapproved by the Commissioner of Insurance. I write separately, in concurrence, because I conclude that the Commissioner's interpretation of Wis. Stat. § 632.895(7) is subject to de novo review, not to due weight deference, and because I conclude that § 632.895(7) permits MercyCare to exclude coverage for gestational carrier services, even though the 2002 MercyCare policy did not do so.

## I. BACKGROUND

¶ 84. The facts from which this appeal arises are not complex. Two insureds, J.M. and C.S., acted as gestational carriers. Both delivered infants pursuant to

[1] MercyCare Insurance Company and MercyCare HMO, Inc. are insurance companies licensed to do business in Wisconsin. As a convenience, I will refer to the insurers as MercyCare.

[2] Both J.M. and C.S. are "gestational carriers." Gestational carrier was defined by the Commissioner of Insurance as "a woman who receives a transfer of an embryo created by an ovum and sperm from either the intended parents or a donor(s). A gestational carrier shares no genetic material with the child with which she is impregnated." Office of the Commissioner of Insurance Final Decision 39 (Dec. 8, 2006) [hereinafter Commissioner's decision]. Because both J.M. and C.S. are gestational carriers and because surrogate mother is a broader term subject to various interpretations, but includes gestational carriers, I employ the term gestational carrier throughout this opinion.

arrangements with unnamed persons not parties to this litigation. MercyCare refused to pay for J.M.'s and C.S.'s prenatal, delivery and postnatal care, asserting that the 2002 healthcare policy under which both were insureds did not cover healthcare services for their pregnancies and deliveries.

¶ 85. J.M.'s and C.S.'s bills for the healthcare services provided to them were paid by persons other than the insureds. Nevertheless, C.S. complained to the Office of the Commissioner of Insurance that Mercy-Care refused to pay for the healthcare services relating to her pregnancy and delivery. C.S.'s complaint brought MercyCare's nonpayment to the attention of the Commissioner of Insurance.[3]

¶ 86. The Commissioner re-examined the 2002 policy, which his office had previously approved, and determined that the policy violated Wis. Stat. § 632.895(7)'s mandatory coverage of maternity services.[4] The Commissioner also concluded that "[e]ven if the surrogacy services could be properly excluded, the 2002 contract is unenforceable because the language is ambiguous."[5] The Commissioner did not approve the 2005 contract because he found that it was too complex, which he concluded could mislead the public.[6]

## II. DISCUSSION

### A. Standard of Review

¶ 87. On appeal, we review the decision of the Commissioner of Insurance, not that of the circuit court. *See Nat'l Motorists Ass'n v. Office of the Comm'r*

---

[3] *Id.* at 31.

[4] *Id.* at 39.

[5] *Id.*

[6] *Id.* at 43.

*of Ins.,* 2002 WI App 308, ¶ 10, 259 Wis. 2d 240, 655 N.W.2d 179.

¶ 88. This appeal requires construction of the MercyCare healthcare policies. We construe an insurance contract as a question of law. *Peterson v. Pa. Life Ins. Co.,* 2003 WI App 166, ¶ 11, 265 Wis. 2d 768, 669 N.W.2d 151. We do so independently, without deference to the agency's interpretation. *Racine Harley-Davidson, Inc. v. Div. of Hearings & Appeals,* 2006 WI 86, ¶ 114, 292 Wis. 2d 549, 717 N.W.2d 184 (Roggensack, J. concurring, citing *Wis. End-User Gas Ass'n v. PSC,* 218 Wis. 2d 558, 565, 581 N.W.2d 556 (Ct. App. 1998)).

¶ 89. The Commissioner's decision turns in part on his interpretation and application of Wis. Stat. § 632.895(7), which we also review as questions of law. *Buettner v. DH&FS,* 2003 WI App 90, ¶ 6, 264 Wis. 2d 700, 663 N.W.2d 282. We may apply one of three levels of deference to an agency's interpretation and application of a statute: (1) no deference, often referred to a de novo review; (2) due weight deference, where we affirm an agency's statutory interpretation and application if it is reasonable and another interpretation is not more reasonable; and (3) great weight deference, where we affirm an agency's interpretation and application if it is reasonable, even when we conclude that another interpretation is more reasonable. *UFE Inc. v. LIRC,* 201 Wis. 2d 274, 284–87, 548 N.W.2d 57 (1996).

¶ 90. In order to employ due weight or great weight deference to an agency's statutory interpretation and application, the agency must have met certain experiential benchmarks.[7] Due weight deference re-

---

[7] Although both present as questions of law and are often intertwined, a difference process is employed in the repetitive

quires the agency to have been charged by the legislature with administering the statute at issue and the agency must have had some experience in interpreting that statute in a consistent fashion. *Id.* at 286–87.

¶ 91. Great weight deference requires that: (1) the agency has been charged by the legislature with administering the statute; (2) the agency has long standing experience in administering the statute; (3) the agency has used its expertise and specialized knowledge in forming its interpretation of the statute; and (4) the agency's interpretation must provide more uniformity and consistency in the application of the statute than would a court's decision. *Id.* at 284.

¶ 92. In the case now before us, the majority opinion gives due weight deference to the Commissioner's interpretation of Wis. Stat. § 632.895(7).[8] I would grant the Commissioner's statutory interpretation no deference.

¶ 93. Usually, it does not matter to the ultimate interpretation of a statute whether this court applies due weight deference or a de novo review because in both cases we interpret the statute. *Cnty of Dane v. LIRC*, 2009 WI 9, ¶ 19, 315 Wis. 2d 293, 759 N.W.2d 571. However, we have set parameters that an agency must satisfy in order to be accorded due weight defer-

application of a statute to varying fact-sets than is employed in the initial statutory interpretation. Patience Drake Roggensack, *Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in This Court of Last Resort,* 89 Marq. L. Rev. 541, 550–52 (Spring 2006) (explaining that giving deference to agency decisions on questions of law was first suggested in regard to an agency's application of a statute to a particular fact-set and later, without further explanation, encompassed statutory interpretation as well).

[8] Majority op., ¶ 38.

ence. *UFE,* 201 Wis. 2d at 286–87. When an agency has not satisfied the parameters for due weight deference, we should acknowledge that by the level of deference we employ.

¶ 94. The Commissioner's statutory interpretation and application of Wis. Stat. § 632.895(7) present on the following undisputed facts. First, the Office of the Commissioner of Insurance is charged by the legislature with administering § 632.895(7). Second, the Office of the Commissioner of Insurance approved the 2002 MercyCare policy, under which J.M. and C.S. were insured, before it was used as an insuring vehicle, thereby concluding that the 2002 policy complied with § 632.895(7). Third, the current version of § 632.895(7) was in effect when the Commissioner's office initially approved the 2002 contract. Fourth, in resolving C.S.'s complaint, the Commissioner concluded that the same 2002 contract that it had approved under § 632.895(7) violated § 632.895(7).

¶ 95. The Commissioner has met the first parameter for due weight deference in that his office has been charged by the legislature with administering Wis. Stat. § 632.895(7). However, the Office of the Commissioner has demonstrated no experience interpreting the statute in a consistent fashion based on the same facts, *i.e.,* the 2002 MercyCare insurance policy. Stated otherwise, the Office of the Commissioner of Insurance has once approved the 2002 MercyCare policy as being in compliance with the statutes and has once concluded that the same policy violated the statutes. Therefore, the agency has not satisfied the second parameter this court has established for due weight deference. Accordingly, I give no deference to the Commissioner's interpretation and application of § 632.895(7).

## B. Interpretation of Wis. Stat. § 632.895(7)

¶ 96. Statutory interpretation begins with the language chosen by the legislature. *State v. Grunke,* 2008 WI 82, ¶ 21, 311 Wis. 2d 439, 752 N.W.2d 769. If the meaning of the statute is plain on its face we ordinarily stop the inquiry. *Id.* (citing *State ex rel. Kalal v. Circuit Court for Dane Cnty,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110). "However, if a statute is 'capable of being understood by reasonably well-informed persons in two or more senses[,]' then the statute is ambiguous, and we may consult extrinsic sources to discern its meaning." *Grunke,* 311 Wis. 2d 439, ¶ 22 (quoting *Kalal,* 271 Wis. 2d 633, ¶¶ 47–48, 50).

¶ 97. Wisconsin Stat. § 632.895(7), provides:

> MATERNITY COVERAGE. Every group disability insurance policy which provides maternity coverage shall provide maternity coverage for all persons covered under the policy. Coverage required under this subsection may not be subject to exclusions or limitations which are not applied to other maternity coverage under the policy.

"Maternity coverage" is not defined in ch. 632. The varying circumstances under which a request for healthcare relating to pregnancy may arise also are not addressed in ch. 632. As a consequence, "maternity coverage" may have different meanings to different reasonably well informed people.

¶ 98. For example, must "maternity coverage" be defined as prenatal, delivery and postnatal services for all women who become pregnant? Or, are the healthcare services that are necessitated by the contract of a gestational carrier not included within the meaning of

"maternity coverage" because they are more accurately characterized as the contract expenses of a woman who agreed to carry a child to which she has contributed no genetic material and to which she claims no rights of parentage?[9] Stated otherwise, while the healthcare expenses J.M. and C.S. incurred were related to their giving birth, they were not expenses incurred to become mothers. Rather, they were the contract expenses they incurred in fulfilling their agreements with third parties.

¶ 99. A construction of Wis. Stat. § 632.895(7) that concludes that the cost of the healthcare services J.M. and C.S. received were contract expenses is consistent with the facts of this case. It is uncontested that as gestational carriers both women contributed no genetic material to the fetuses they carried and that the healthcare bills of J.M. ($16,774.64) and C.S. ($18,510.84) have been paid by third parties. Therefore, any payment by MercyCare for the costs of these gestational carrier services will not inure to the benefit of the insureds, but rather, to the benefit of persons who are not insured by MercyCare.

¶ 100. Because reasonably well informed persons could come to the conclusion that Wis. Stat. § 632.895(7) requires that healthcare services must be

_____

[9] *See* Elizabeth S. Scott, *Surrogacy and the Politics of Commodification,* 72 Law & Contemp. Probs. 109 (Summer 2009) (discussing the social policy concerns of the various forms of surrogacy, including gestational carriers); *see also* Anna L. Benjamin, *The Implications of Using the Medical Expense Deduction of I.R.C. § 213 to Subsidize Assisted Reproductive Technology,* 79 Notre Dame L. Rev. 1117 (April 2004) (questioning whether the expenses of creating a child through expensive assisted reproduction should qualify as a medical expense deduction within the meaning of I.R.C. § 213).

provided to all pregnant women who are also insureds or to the conclusion that it does not apply to gestational carrier services, which are contract expenses, the statute is ambiguous. *Kalal*, 271 Wis. 2d 633, ¶¶ 47–48. Accordingly, in attempting to discern its meaning, I consult extrinsic sources. *Id.* at 50.

¶ 101. The legislative history underlying Wis. Stat. § 632.895(7) gives no indication that the legislature considered insureds who acted as gestational carriers when it mandated coverage for "maternity services." Subsection (7) was amended to its current language by 1985 Wisconsin Act 56, § 33. It began as Assembly Bill 510. The Legislative Reference Bureau's note provides that the amendment to subsection (7) has the effect of requiring "the same maternity coverage for a dependent spouse of a male employee as for a female employee." Another note explains:

> Current law requires every group disability insurance policy which provides both coverage of dependent children and maternity coverage to also provide maternity coverage for dependent children. . . .
>
> This subsection requires every group disability insurance policy which provides maternity coverage to any individual to provide the same level of maternity coverage to all persons covered under the policy.

Wisconsin Legislative Council Staff note of September 23, 1985. Therefore, if a person who was not a policyholder, a spouse of a policyholder or the dependant child of a policyholder, but nevertheless was an insured, became pregnant, maternity coverage is required.

¶ 102. The legislature could require coverage for gestational carrier services. However, if coverage for gestational carrier services were considered by the legislature, because it is such a complicated social

question, there surely would have been some indication of such a discussion.[10] But, there is not. Accordingly, I conclude that although the pregnancy of a gestational carrier who carries a child under a contract with a third party could be mandated, there is no indication that the legislature did so in Wis. Stat. § 632.895(7).

## C. MercyCare Policies

### 1. 2002 policy

¶ 103. The 2002 MercyCare policy provides in relevant part:

PREGNANCY BENEFITS

. . .

Non-Covered Services:

- Surrogate mother services.

- Elective abortions.

- Maternity services received out of the service area in the last 30 days of pregnancy without prior authorization from the Plan except in an emergency. Prior authorization is based on medical necessity.

- Amniocentesis or chorionic villi sampling (CVS) solely for sex determination.

¶ 104. MercyCare relies on the term, "Surrogate mother services," for its exclusion of coverage for J.M.'s and C.S.'s prenatal, delivery and postnatal care. Surro-

---

[10] *See generally* Scott, *supra* note 9 (discussing the various types of surrogacy, including gestational carriers, and how these types of pregnancies may relate to current parentage and abortion concepts).

gate mother services is not defined in the 2002 policy. That term could encompass a variety of healthcare services, some of which are not at issue in this case.

¶ 105. For example, surrogate mother services could include the extensive hormone therapy that is required prior to implantation of zygotes[11] in order to permit a gestational carrier to carry a child to which she has provided no genetic material. Or, it could refer to similar treatment for a surrogate who has provided the ovum for the zygote with which she will be impregnated. It could also be read to cover the usual prenatal, delivery and postnatal care after the pregnancy has begun for a pregnant woman who carries a child under any type of surrogacy. Or it could encompass more than one of those circumstances, or perhaps some circumstance that I have not mentioned.

¶ 106. Based on this lack of precision in defining surrogate mother services, I conclude that the 2002 policy is ambiguous. The Commissioner also concluded that the 2002 MercyCare policy is ambiguous because it does not adequately define surrogate mother services.[12]

¶ 107. An ambiguous insurance policy, with undefined terms, is construed as it would be understood by a reasonable insured. *Acuity v. Bagadia,* 2008 WI 62, ¶ 13, 310 Wis. 2d 197, 750 N.W.2d 817. Policy language that relates to coverage and is ambiguous is construed in favor of the insured, as affording coverage. *Id.*

¶ 108. Because MercyCare did not define surrogate mother services as healthcare services provided to a woman who contracted to carry a child to which she

---

[11] When fertilization of the egg is accomplished in vitro, the resulting combination of the egg and the sperm with which a woman is impregnated is the zygote.

[12] Commissioner's decision at 42.

contributes no genetic material and to whom she asserts no rights of parentage, I construe the policy against MercyCare and conclude that the costs of the healthcare provided to J.M. and C.S. must be born by MercyCare.

### 2. 2005 policy[13]

¶ 109. The 2005 MercyCare policy provides in relevant part:

PREGNANCY BENEFITS

. . .

Non-Covered Services:

* Treatment, services or supplies for a surrogate mother or any pregnancy resulting from *your* service as a surrogate mother.

. . .

SURROGATE MOTHER

Surrogate mother means a woman who, through in vitro fertilization or any other means of fertilization, gives birth to a child which she may or may not have a genetic relationship to, or an individual who provides a uterus for the gestation of a fertilized ovum obtained from a donor when the child will be parented by someone other than the woman who[] gives birth.

---

[13] Neither J.M. nor C.S. claim coverage under the 2005 policy. Therefore, even though the Commissioner has held that the 2005 policy is not in compliance with Wis. Stat. § 631.20, his decision does not affect payment to J.M. and C.S. Furthermore, since the 2005 policy has not been approved by the Commissioner, it cannot have been used as an insuring vehicle or have affected any other insureds.

¶ 110. As if in recognition of the ambiguity in its 2002 policy, while C.S.'s complaint was pending in the Office of the Commissioner of Insurance, MercyCare submitted the 2005 policy for consideration. The 2005 policy defines surrogate mother, as set out above.

¶ 111. The Commissioner denied approval of the 2005 policy based on his authority under Wis. Stat. § 631.20(2)(a)3.[14] The Commissioner explained:

> While MercyCare has argued that it is only trying to limit its coverage to provide personal health insurance and "not cover expenses incurred in activities from which the insured profits or expenses are incurred on behalf of persons not covered under the policy.". . . [T]here is nothing in the 2005 Contract's definition of surrogate mother that limits coverage to those situations. Rather, as OCI argues, the definition "permits MercyCare broad discretion in applying its exclusion to any number of women based solely on how and why they are pregnant," and further has the "unintended effect of restricting coverage to some insureds they may or may not intend to exclude." The fact that the policy drafter does not understand the implications of the language in its own policy supports a finding the language is unnecessarily verbose or complex.

¶ 112. Wisconsin Stat. § 631.20(2)(a)3. permits the Commissioner to disapprove a proposed insurance policy upon a "finding" that the policy is "unnecessarily verbose or complex in language." I agree with the finding of the Commissioner. The definition that MercyCare employs in the 2005 policy does not accomplish the purposes MercyCare says it hoped to achieve and could easily mislead a reasonable insured.

---

[14] Commissioner's decision at 43.

## III. CONCLUSION

¶ 113. In conclusion, I agree with the majority opinion that the 2002 MercyCare policy did not exclude gestational carrier services for the pregnancies and deliveries of J.M. and C.S. I also agree that the 2005 MercyCare policy was properly disapproved by the Commissioner of Insurance. I write separately, in concurrence, because I conclude that the Commissioner's interpretation of Wis. Stat. § 632.895(7) is subject to de novo review, not to due weight deference, and because I conclude that § 632.895(7) permits MercyCare to exclude coverage for gestational carrier services, even though the 2002 MercyCare policy did not do so.

¶ 114. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join this concurrence.